241 S.W.2d 725 (1951)
DAWSON
v.
DAWSON et al.
No. 21564.
Kansas City Court of Appeals. Missouri.
June 4, 1951.
*726 Clark, Peterson, Becker & Nelson, Columbia, for petitioner.
Warren D. Welliver, Columbia, Alexander, Ausmus & Harris, Columbia, of counsel, for respondents.
SPERRY, Commissioner.
This is a habeas corpus proceeding, instituted in this court by Jean L. Dawson who seeks the custody of her two daughters, *727 Marian, aged 5, and Evalyn, aged 3. They are the children of petitioner and respondent, John B. Dawson, petitioner's former husband, and are presently living in the home of respondents, John J. and Eva Dawson, near Columbia, where John B. Dawson also lives. John B. Dawson is the son of John J. and Eva Dawson. We will refer to John B. Dawson as respondent, and to John J. and Eva Dawson by name.
After the pleadings were made up a brief hearing was had, at which all of the parties appeared, including the children and counsel. Evidence was heard and the cause was submitted on the pleadings and the evidence, including depositions taken by the parties and filed herein, and the evidence and exhibits presented in the circuit court of Boone County, Missouri, at a trial on a petition for writ of habeas corpus, filed in that court by petitioner, prior to the institution of the instant case.
The record discloses that: Petitioner was legally married to respondent in 1940; they became citizens of the State of Washington in 1944; Marian was born January 16, 1945; Evalyn was born April 10, 1947; petitioner was adjudged mentally incompetent and committed to Northern State Hospital, Washington, May 1, 1947; at respondent's request, Eva Dawson went to Seattle in May, 1947, and remained until September, caring for the children in their home there; September 15, 1947, the children were brought to the home of John J. and Eva Dawson, where they have since remained; on November 12, 1947, respondent filed petition for divorce in Superior Court of King County, Washington; on June 27, 1948, petitioner was released from the mental hospital, finally discharged on January 23, 1949, and adjudged sane on February 16, 1949; on July 8, 1949, a final decree of divorce was granted to both parties, and temporary custody of the children awarded to the paternal grandparents, "who reside near Columbia, Missouri;" and it was provided that jurisdiction of the children was retained, with permission given to petitioner to seek their custody by motion to modify the decree "after 12 months from May 10, 1949, provided she will not have suffered a recurrence of her recent mental disability."
On June 13, 1950, petitioner duly filed her motion to so modify the decree, said motion was sustained, and respondent was ordered to bring said children to Seattle and deliver custody to petitioner, on or before July 2, 1950. Respondent ignored the above order and, on July 24, 1950, he was adjudged to be in contempt of court. He was sentenced to serve sixty days in jail. On August 2, 1950, respondent was ordered discharged under a writ of habeas corpus, by another division of Superior Court of King County, which held that the court had no power to enter an order changing the custody of the children, because said children were beyond the court's territorial jurisdiction when the divorce action was instituted and when the modification was decreed.
Thereafter, petitioner instituted a habeas corpus action in the circuit court of Boone County, Missouri, wherein she sought custody of the children. Petitioner, respondent, and respondent's parents, were present and participated in that hearing. The court found that "it is for the best interest of the minor children, Marian Dawson and Evalyn Dawson, that their present status be not disturbed, * * *." The children were remanded to and placed in the temporary care of John J. and Eva Dawson. The instant action followed.
Petitioner contends that we are bound to respect and enforce the modified custody decree. The general rule is that, where there has been no change in conditions affecting the welfare and best interest of children whose custody has been legally adjudicated by a court of a sister state, having jurisdiction of the subject matter and of the parties, the judgment will be given full faith and credit by the courts of every other state. 50 C.J.S., Judgments, § 889, page 470. However, such a judgment is entitled to receive no more faith, credit, and respect by the courts of this state than that accorded to it in the state where rendered. 50 C.J.S., Judgments, § 889, page 473; Daugherty v. Nelson, Mo.App., 234 S.W.2d 353, 360.
*728 Respondent urges that, since the judgment rendered by the Superior Court of King County, Washington, touching custody of the children, has been repudiated and declared invalid by another division of that court, we may not recognize or respect it. Had the latter adjudication emanated from the Supreme Court of Washington, there could be no question of the soundness of respondent's position. But it was not rendered by the Supreme, or any appellate court; and it was rendered in a habeas corpus proceeding in which petitioner was not a party, although she was represented by her attorney, who filed a brief.
Both parties have cited Washington Supreme Court decisions tending to support their respective views and positions with reference to the validity of the custody decree. None of the cases cited appear to be entirely similar, on the facts, to that here presented. Here, both parties to the divorce action were present in court but the children had been in the State of Missouri for a period of sixty days prior to the filing of the petition, for a period of eighteen months prior to the rendition of the divorce decree, and for a period of a year following rendition of that decree, the latter residence being formally ordered by the court in granting temporary custody to the grandparents who then lived in Missouri and were not present in court. No fraud was practiced on the court, nor is there involved any question of abduction or removal of the children. John J. and Eva Dawson have never been summoned into court, or ordered to surrender custody.
The question presented is somewhat difficult, and we have found no authority that directly rules a situation such as the facts in this case present. In Daugherty v. Nelson, supra, 234 S.W.2d 357, it is pointed out that a proper court of the state of a child's domicile has jurisdiction to make an award of custody even though the child may not be physically present in that state, but that it is difficult, sometimes, to determine the state of domicile. That is the problem here.
Let us assume, for the purpose of deciding this case that, at the time the original decree of divorce and custody was entered, the children were domiciled in Washington. Under such a theory the court had jurisdiction to enter a legal judgment, granting custody, to any suitable person, in the best interest of the children. It could have granted custody to either of the parents, or to any citizen of the State of Washington. Had that been done, the children would have retained Washington as their state of domicile; and the Superior Court of King County would have retained jurisdiction to modify such order. However, the court granted legal custody to John J. and Eva Dawson, neither of whom were citizens or residents of the State of Washington, but were domiciled in the State of Missouri where, and with whom, the children then resided. They were not parties to the action, nor did they agree to abide by the orders of the Washington court, as was done in a similar situation in Drew v. Drew, Mo.App., 186 S.W. 2d 858. By the decree of custody, together with their physical presence in the State of Missouri at that time, the children became, and have since remained, domiciled in Missouri. Consequently, the Washington decree, as modified, is invalid for lack of jurisdiction to render it. This is true because the court had previously vested the grandparents with legal custody and, in effect, divested both parents of custody.
Children, ordinarily, are domiciled in the state where they live with their parents. If the parents live separately they are domiciled at the home of the parent with whom they actually live. Daugherty v. Nelson, supra, 234 S.W.2d 358. Every person is held to have a domicile at all times. When he loses one, he immediately acquires another. 28 C.J.S., Domicile, § 13, page 30. Since the children could not choose a domicile, and their parents no longer could do so for them, it should be held that their grandparents had that power, that their domicile became that of the children from and after the entry of the original award of custody. Thereafter, the Washington Court had no jurisdiction *729 to direct the custody and control of the children, who were citizens of and domiciled in this state, Beckmann v. Beckmann, 358 Mo. 1029, 1033, 218 S.W.2d 566; Daugherty v. Nelson, supra; Ex parte Mullins, 26 Wash.2d 419, 174 P.2d 790, 803; Stallings v. Bass, 204 Ga. 3, 48 S.E.2d 822, 824; and we are not required to recognize and enforce the Washington decree.
This case is to be distinguished from one where a divorced parent is granted custody of children and thereafter removes, with them, to another state.
We have jurisdiction of all parties, including the children, and may make such an award of custody in this case as the welfare of the children may seem to require. Daugherty v. Nelson, supra, 234 S.W.2d 363. It has often been said that, other things being equal, the mother is best fitted to care for and guide a child through infancy and adolescence, and that such a child's interest requires that she be given custody. However, that rule does not apply in a case where the divorce court has decreed custody in the grandparents, to the exclusion of the mother. It would seem, rather, that the contrary presumption should be indulged until proof of change of circumstances is made satisfying the court that the interest of the children require that custody be changed. Drew v. Drew, supra, 186 S.W.2d 867; Ruedlinger v. Ruedlinger, 222 Mo.App. 819, 10 S.W.2d 324, 326.
It is undisputed that petitioner, within less than a month after the birth of Evalyn, suffered a serious mental collapse. She was adjudged to be mentally incompetent and was confined in a state hospital for treatment. She was undernourished and weak; would not eat; was violent and confined in a "strait jacket" for a time; would not converse with visitors; became violent on one occasion and kicked a woman attendant so hard that she was confined to bed for two days. She was released more than a year after confinement, and finally discharged in January, 1949. Some eighteen months before her final discharge the children were brought to Missouri, and petitioner did not see them for a period of more than three years, until August, 1950.
They are living in the home of John J. and Eva Dawson, a clean comfortable, three bedroom, modern farm house, located on a farm of 150 acres, a few miles from Columbia. The Dawsons are, without doubt, people of intelligence and of high character. They are active in civic and church affairs. He is a member of the board of directors and clerk of the school located near their home. Both are active in P.T.A., and their home has frequently been made available for social affairs of the school. His income is from $4,800 to $5,000 per year. The children regularly attend church and Sunday School services. Various neighbors gave evidence of the excellent character of the home and of the care the children receive therein. Respondent now resides in Missouri, where he is an engineering student at the university. He has two years of school work to finish before graduating. He is receiving aid under the GI Bill, $84 per month for himself and $36 for the two children. He is now married and he and his wife live at the home of his parents, who will have none other of their children at home, until his graduation. His wife testified to the effect that she was willing to devote a part of her income, as a R.N., to the support of the family, and would gladly have the children in the home of herself and respondent, if it were permitted, after his graduation from college.
There was testimony, by two neighbors of petitioner, to the effect that, prior to her illness, she was a good housekeeper and mother; that since her discharge from the hospital she has kept her house and property well, has attended church as often as her employment permitted, and has shown no indication of a further breakdown.
Miss Werblow, dietitian at Seattle General Hospital, testified to the effect that petitioner has been employed as a pantry maid, under witness' supervision, since July 29, 1949, at a salary of $150 per month; that her work hours are from 6:30 a. m. until 3 p. m.; that she earns about $150 per month. *730 Petitioner lives in a four room modern house, awarded to her by the divorce decree; it is located 15 miles from Seattle; she pays $30 per month on a mortgage on the house; her transportation costs about $20 per month; she earns $150 per month, out of which is taken taxes and social security. Eva Dawson stated that petitioner was a good girl and a good mother, prior to her illness. John J. Dawson offered no criticism of her except to comment that, when she lived at their home, while respondent was in the air service, she seemed to be unable to plan ahead for Marian when she took her to see respondent at distant points.
Petitioner's mother has been in Seattle since petitioner's illness began. She left the home of respondent shortly after respondent's mother arrived to aid the family and did not, thereafter, aid in the care of the children, but visited her daughter at the hospital. She has been employed, but she recently underwent an operation. She is about 56 years of age and is described by Dr. Buchmeier, a medical witness who attended petitioner when she was first a patient at the hospital, as being of a nervous temperament and aggressive in influencing the decisions and actions of petitioner. Her home is in Ohio, where her husband, petitioner's father, lives. He is a retired civil service employee.
It is apparent, from evidence, that petitioner considers the possibility of removing to the home of a widowed sister, in Cincinnati, Ohio. That sister testified to the effect that she would be glad to have petitioner live with her, in a half of a double house which she contemplates buying for the sum of $2,500, $1,500 cash, and a mortgage for the balance. She stated that she would aid petitioner to the extent of $15 per week, whether she moved to her home or continued to live in Seattle. She is a practical nurse, has a daughter, now about 13 years of age, and her employment is by private patients.
Another sister, living in Ohio, earns $100 per month. She is single and stated that she would aid petitioner, financially, to the extent of $10 per week, and would make clothing for the children. The single sister lives in the home of her widowed sister, paying $10 per week for board and room.
Dr. Chiasson, engaged in the psychiatric practice of medicine at Columbia, Missouri, consultant for the Missouri Training School Board and for other state and private agencies, was produced as a witness on behalf of petitioner. She testified to the effect that psychiatry is a field of medicine devoted to the study of mental disturbances or interpersonal relationship; that she examined petitioner August 25, 1950, with a view to testifying in the Boone County Court; that she thoroughly investigated petitioner's case history; that, in her opinion, petitioner is sane; that she is as normal as most individuals are; that there are two ways of classifying her mental illness; according to the American Psychiatrist system it is a schizophrenia of the catatonic type, and according to another system that does not parallel it, it is a psychosis associated with pregnancy; that such a condition may develop if the expectant mother is under marked strain prior to delivery; that petitioner told her that she was not getting along well with her husband (prior to Evalyn's birth); that she feared for the future of the children; that she always had a fear that perhaps something would happen, and her husband threatened they would be taken from her. Witness stated that 95% of the patients, if they have a remission, will have it within a year after release from hospital; that since petitioner has had no recurrence during a period of three years, in all probability she will suffer none; that she considers her a competent person to care for the children, and that it would be to the children's best interest for her to rear them.
Dr. Buchmeier testified to the effect he practices psychiatric medicine at Seattle; that he was a resident physician in Northern State Mental Hospital when petitioner became a patient therein; that he remained in that position, and as a member of the staff, from January, 1946 until May 31, 1948; that he served on the staff of the Institute of Living, as a psychiatrist, from May 31, 1948 until July 8, 1950; that he was directly responsible for petitioner's *731 treatment from May until September, 1947; that he saw her twice a day; that she was acutely disturbed and it was necessary to restrain her to prevent her harming her-self or others; that a part of the time she was in a strait jacket, at others merely restrained in bed, for a period of three months; that, in November, 1950, at the request of petitioner and her mother, he examined her with a view to giving evidence in this court; that, before examining her, he advised her that respondent talked with him regarding his examination of her, and that his testimony would not be shaded or colored either for or against her; that, nevertheless, she still requested the examination, for which she paid; that, afterward, he informed her of his findings, of the nature of his testimony, and told her that he would only testify if she had a lawyer present at the time, that otherwise he would not give evidence; that he gave her a general psychiatric examination of more than an hour; that he formed the opinion that she is suffering from a deepseated personality disorder; that she is not psychotic has personality factors directly connected with the type of illness for which she was hospitalized; that she lacks emotional depth, smooth functioning of thought processes; that she mentioned a number of things associated with the children that he considered unduly critical of them and of the grandparents; that the outstanding factor in causing him to reach his present opinion was petitioner's lack of understanding of her previous illness, or that she had been seriously ill; that she definitely lacked understanding as to why she was ill; that she believed her illness was due to the effect that other people and outside circumstances had on her, and that there was little or no emotional turmoil or conflict associated with it; that she explained her excitement, her refusal to eat for a period of two months, and her other behavior, as due to medication, and thought that if she would not eat she would be discharged from the hospital; that she felt that there was really nothing ever wrong with her; that she blamed respondent for having hospitalized her, because she could have recovered by rest; that he should not have taken her to visit Dr. Nicholson, a psychiatrist who recommended hospitalization; that she questioned the medication given her by Dr. Nicholson and called him to ask if it should taste as it did; she still does not understand that such behavior was abnormal; that she criticised, as undesirable, the fact that the children had been given intelligence tests; that her attitude toward the children is vague, fantastic, not a normal mother's attitude; that she felt that respondent did not want the children but that his parents wanted them; that she stated that the children are going to school and the grandfather works in the school in order to prevent her from taking the children. The witness gave it as his opinion that petitioner will not be benefited by being given custody of the children; that their care will be too great a strain for her to carry; that she requires a quiet, routine life which does not require her to be emotional; that the children would not benefit from her; that she could not provide the proper emotional atmosphere; that she should not be engaged in this custody contest which, he believes, is not coming from petitioner, but from her mother; that petitioner lacks capacity to feel and to love in an unselfish, out-going manner; that she can emote, shower attention on the children, but that real depth of feeling, of a mother for a child, is missing; that petitioner's mother influences her a great deal; that Mrs. Leicht is nervous and would not have a steadying influence on the family.
Dr. Chiasson stated that the cause of petitioner's mental aberration, according to one method of classification, was a psychosis associated with pregnancy. Psychosis is defined as a functional mental disorder, that is, one unattended with structural changes in the brain. Webster's New International Dictionary, Merriam Series. She stated that, according to the American School of Psychiatry, petitioner would be classified as a catatonic type of schizophrenic; that the two classifications are not parallel. She did not state which classification should be applied in this case. However, Dr. Buchmeier stated that petitioner is not psychotic "but she has personality factors directly connected with the type of illness for which she was hospitalized * * *." *732 He was not asked what she was hospitalized for but, from his testimony, when considered in connection with that of Dr. Chiasson, it is fairly inferable that she is a schizophrenic, which term is defined in Darlan's Medical Dictionary, 20th Ed. page 1300, as Bleurer's term for Dementia praecox, a cleavage of the mental functions. Also see Gray's Attorneys' Textbook of Medicine, 2nd Ed. page 370. Catatonic is defined by Darlan, in the same volume, supra, page 289, as a form of schizophrenia characterized by negativistic reaction and stupor, excitement, or impulsive behavior. It is predominantly motor and patients display a waxy flexibility, or a catalepsy. It is usually chronic and the patient may suddenly become maniacal. Gray's Attorneys' Textbook of Medicine, pages 376, 378, 379. "Predictions of the outcome are impossible. Should they apparently recover, stoppage of progress is all that occurs, with residual changes permanent in character." Gray's Attorneys' Textbook of Medicine, page 381.
Regardless of whether the Washington Court had jurisdiction to modify the decree of custody, this court has jurisdiction of all the parties, has power to determine whether or not there has been a change in conditions affecting the interest of the children and, if there has been such a change, has power to make such an award of custody, in view of such changed conditions, as will be in the interest of the children. Daugherty v. Nelson, supra, 234 S.W.2d 362. We think there has been such a change in conditions.
At the time the modified decree was entered the Washington Court found, in effect, that petitioner had fully recovered from her mental disorder and was then stable and, therefore, a suitable person to have custody of the children. Assuming that to have been the true condition at that time, nevertheless the disease from which she suffers is one that may not remain static. It is chronic and may become active and progressive at any time. From the medical testimony of Dr. Buchmeier it is clear that petitioner's mental condition, in November, 1950, some four months after the modified decree was entered, was not good; that she then suffered from a deep-seated personality disorder; that she displayed personality factors directly connected with the type of illness for which she was hospitalized. We must conclude that her mental condition had become and was, unstable and unsatisfactory in November; and we will assume that condition continues to exist until the contrary is shown. Such a changed condition justifies our refusal to sustain her petition for custody.
The children are well located, in a good, comfortable, Christian home. Their financial security, during the foreseeable future, is assured. They will enjoy the benefit of one parent's association, in addition to the direct supervision of their grandparents. It would not be in the children's interest to award custody to petitioner.
The petition should be dismissed and, under the conditions and circumstances now existing, the children remanded to the custody of John J. and Eva Dawson; and it is ordered that the petitioner may visit said children at the home of their grandparents at such times as shall be reasonably convenient to said grandparents and so as not to interfere with the health of said children or their attendance at school, the children, however, not to be taken from the home of the grandparents unless accompanied by one or the other of said grandparents.
BOUR, C., concurs.
PER CURIAM.
The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The petition is dismissed and, under the conditions and circumstances now existing, the children remanded to the custody of John J. and Eva Dawson; and it is ordered that the petitioner may visit said children at the home of their grandparents at such times as shall be reasonably convenient to said grandparents and so as not to interfere with the health of said children or their attendance at school, the children, however, not to be taken from the home of the grandparents unless accompanied by one or the other of said grandparents.
All concur.