Forrest William STONE, Plaintiff-Appellant (Respondent),

v.

Dorothea Carla STONE, Defendant-Respondent (Appellant).

Nos. 31403, 31406.

St. Louis Court of Appeals.

Missouri.

April 21, 1964.

Motion for Rehearing or to Transfer to Supreme Court Denied April 29, 1964.

Opinion on Motion to Modify May 22, 1964.

Charles M. Shaw, Clayton, for appellant-respondent.

Greensfelder, Hemker & Wiese, Forrest M. Hemker, Donald S. McDonald, St. Louis, for respondent-appellant.

ANDERSON, Judge.

On August 22, 1961, the plaintiff, Forrest William Stone, filed suit against his wife, Dorothea Carla Stone, seeking a divorce and the custody of the four minor children of the parties. Defendant filed an answer and cross-bill for divorce and custody of the children, and a second count sounding in equity, which prayed that in the event the custody of the children was not determined on plaintiff's petition or defendant's cross-bill, the court award her custody of said children together with a reasonable amount for their support and maintenance. Plaintiff filed a reply in the nature of a general denial to defendant's cross-bill, but filed no pleading to defendant's equitable cross-bill.

After a trial of the issues raised by the pleadings, the Court denied both plaintiff and defendant a divorce, and on defendant's equitable cross-claim granted defendant

general custody of the children with an award of $500.00 per month for their support. Plaintiff has appealed from the judgment, and defendant has appealed complaining of that portion of the judgment dismissing her cross-bill for divorce.

Plaintiff, as appellant, has filed a brief in this court, which clearly does not comply with the provisions of Rule 83.05. The main point urged is that under the evidence plaintiff should have been granted a divorce and custody of the children. The transcript contains 908 pages of testimony. In addition, there were numerous exhibits introduced and lodged here with the transcript. The statement part of plaintiff's brief contained approximately 2½ pages, and makes no reference to any of the facts developed at the trial. Were it not for the fact that the welfare of the children is involved, and the further fact that defendant, as respondent, has made a full and complete statement of the facts, we would be disposed to invoke against plaintiff the sanctions authorized for non-compliance with the rules.

Defendant, Dorothea Carla Stone, was born in Bremen, Germany; June 4, 1919. Her parents were Dorothea and Carl Weingaertner. She received a high school education and business school training. In 1946, while residing in Bremen, she met plaintiff, Forrest William Stone. At that time she was employed as a housekeeper for a family of a member of the Armed Forces of the United States, having been assigned to that duty by the Occupation Force. Her task under said assignment was to take care of a baby girl of a family.

Plaintiff, Forrest William Stone, a resident of St. Louis, was employed by the American Express Company in early 1946, and worked in London, Paris, Frankfort, and Bremen, arriving in the latter city some time prior to December 23, 1946. He was employed as a salesman of Knapp Monarch Company around July, 1948, and at the time of trial, June 1962, was National Salesman-

ager for that company, earning $18,814.78 per year.

Plaintiff and defendant fell in love after they met in Bremen in 1946. Shortly thereafter they engaged in sexual relations, which continued until their marriage. Prior to the marriage and in 1947, defendant became pregnant. An abortion was performed for the reason that plaintiff thought it would not look good if they came to the United States with a baby. Plaintiff obtained the necessary permits for defendant to leave Germany, and arranged for her passage on the Lykes Line. She arrived in New Orleans on June 4, 1948, where plaintiff who had preceded her to the United States, met her. They then proceeded to Pine Bluff, Arkansas, by automobile, where they were married. After the marriage was performed, the parties drove to Little Rock, Arkansas, and on their wedding night of June 8, 1948, according to defendant's testimony, plaintiff flew into a terrible rage and started to choke her and to curse and swear. Defendant ran out of the room, and returned only when plaintiff begged forgiveness. Plaintiff denied that this occurred.

From Little Rock the parties proceeded to Kimmswick, Missouri, and took up residence across the street from the home of plaintiff's parents. Plaintiff testified that within a week or two defendant started to exhibit a temper, which throughout the marriage was accompanied by scratching, fighting, biting, yelling, striking him with a tea glass, cans, a barometer, knives and hammers; that she would not fix his breakfast while living in Kimmswick; that she made disparaging remarks about the United States and refused to become a United States citizen. Defendant denied such conduct and testified that plaintiff was the one who had temper tantrums and inflicted verbal and physical abuse upon her throughout the marriage. These generalities were subsequently particularized by the parties, and were of such a character as to justify a finding of indignities which would warrant the granting of a divorce to either

party whose testimony was believed by the trial judge; provided, of course, it could be found that such person was the innocent and injured party.

Within a few months the parties moved to the home of plaintiff's parents, and lived there for a period of eight months. Defendant testified that during that period, plaintiff began telling her he wanted to get rid of her and was going to send her back to Germany; that he called her a "God damned bitch", "German filth", a "cheap tramp", and expressed a desire to throw her out on the highway, where she belonged. On one occasion he ripped off her nightgown and slapped her. Defendant further testified that she heard plaintiff discussing with his parents sending her back to Germany, stating he was going to take the necessary steps toward this end, and in August, 1948, actually took defendant to the Federal Building in St. Louis to get papers to send her back to Germany.

While living with plaintiff's parents, plaintiff started working with his father, who was an employee of Knapp Monarch Company. He traveled as a salesman. Defendant testified that during this period she found contraceptives in plaintiff's shaving kit when he would return from trips, and lipstick stains on his clothing. She also found a woman's handkerchief, but plaintiff denied any improper conduct, explaining he was without a handkerchief and bought one at a dime store.

In June, 1949, the parties moved to Milwaukee, Wisconsin. Plaintiff was then a salesman for Knapp Monarch and worked the City of Milwaukee and surrounding territory. Defendant testified that during the period of their residence in Milwaukee, plaintiff continued to call her a dirty, filthy German pig and expressed himself as not liking to talk to her, saying that she should go back where she came from; that she was a foreigner and not wanted. She said that he complained about and criticized everything defendant did and would fly into terrible tantrums and rages; that he would charge at defendant, taking her by the hair and pulling her down and bumping her against the floor, saying, "Crawl you dog, crawl in front of me because you are eating my food, I took you out of a war-torn country; you came without a shirt on your back and everything you eat or live off of is mine and my money bought it." Defendant further testified that plaintiff twisted her arm and legs, referred to her as having big, fat, ugly pig eyes; held cigarettes close to her like he was going to burn defendant's eyes and face; tore off her clothes; stated that a new job and marriage were too much for him and he wanted her to leave; that he had seen a lawyer about a divorce and found the only ground for divorce in Wisconsin was adultery. This conduct was denied by plaintiff.

Defendant found a book belonging to plaintiff containing names of women in it, with their phone numbers. She confronted plaintiff with it and testified that plaintiff said he needed companionship. Plaintiff testified that women whose names were in the book were demonstrators for Knapp Monarch and used to demonstrate the products for Knapp Monarch in retail outlets. Defendant testified that on one occasion when a female person called, plaintiff ripped the wires of the phone off the wall. Plaintiff testified that the call was from a man who spoke with a German accent, and defendant was the one who ripped the phone off the wall. Defendant denied this. Defendant suffered a miscarriage, and while she was hemorrhaging as a result of it, plaintiff ordered her out of the house, but later took her to a doctor.

On March 2, 1950, defendant left plaintiff and brought a separate maintenance suit. This suit was dismissed on March 10, 1950. According to defendant's testimony the suit was dismissed when plaintiff promised that things would be different. Plaintiff denied asking defendant to come back, stating she had said she had made a mistake and requested she be allowed to return.

Plaintiff left defendant on May 15, 1950, and filed a suit for divorce in St. Louis. Defendant thereafter filed a cross-bill in this suit. Prior to the filing of this suit, and after plaintiff had left defendant, a man named Bloom came to defendant's door and told defendant that plaintiff had sent him and said something about a ticket. This man appeared to be about 60 years old. Defendant testified she had been left with only a few dollars, and at the time of Bloom's visit she desired to find plaintiff and was of the opinion she could find him in Rockford, Illinois. Bloom was traveling by automobile from Milwaukee to St. Louis, and defendant rode with him intending to locate her husband in Rockford. Bloom drove to the Ambassador East Hotel in Chicago, where he and defendant had dinner. Defendant testified that Bloom then said it was getting too late for them to go on to Rockford. Bloom then said he would get a room for defendant at the hotel. He went to the desk and returned with a key. He then accompanied defendant to the room and insisted on coming in, and threatened defendant that he would tell her husband if she refused to admit him. Bloom and defendant spent the night in the same room. Defendant denied that they had intercourse during the night. Defendant returned to Milwaukee the next day, and later received a phone call from plaintiff's lawyer, George Skagmo. She testified that in response to this call she went to the lawyer's office, where plaintiff and Skagmo requested that she sign a statement admitting intimacy with Bloom. She further testified she refused to sign the paper because she had not been intimate with Bloom. She had no further contact with Bloom except for an automobile ride with Bloom after her return to Milwaukee.

Plaintiff's testimony regarding the foregoing incident was that he found a postcard of the Ambassador East Hotel and asked defendant about it; that defendant said she had had lunch there with a woman friend (defendant admitted this was a falsehood); that he had seen a red Pontiac in front of

their dwelling place every time he came home; that he took the license number, got the name of Walter Bloom, checked the register at the hotel in Chicago and saw a registration of Walter Bloom and wife; went to see Bloom, and confronted defendant with this information. He stated defendant at first denied spending the night with Bloom, but later admitted so doing and admitted having intercourse with Bloom at the time. Defendant denied admitting she had intercourse with Bloom, but admitted spending the night in the room with him. She testified she did not have intercourse with Bloom on the occasion in question.

A reconciliation was discussed and consummated shortly afterward at Rockford, Illinois. Plaintiff testified that at this time defendant told him she had been engaged to Gunther Roessler, and before leaving Germany had gone to Cologne to see Roessler and explain why she was leaving Germany; that he (plaintiff) found a bunch of letters to defendant from Roessler, and had them translated; that Roessler was writing defendant to the effect that if she had made a poor marriage, it was her problem and that he was then married; that when plaintiff found out defendant was pregnant he tore up the letters. Defendant admitted writing one letter to Roessler when plaintiff left her in 1950.

Plaintiff further testified that at the time of the reconciliation, defendant told him of her relations with Franz Springer, a German soldier to whom she was engaged and who was later killed in battle in 1940. He stated she had a miscarriage, and that the child was buried in the backyard. He stated these disclosures were made incident to the reconciliation, when both were laying out their characters and telling the whole story so as to have a new start. Defendant denied these disclosures were made in 1950, and stated plaintiff was told of this shortly after the parties met.

Following the reconciliation plaintiff discontinued his employment, and the parties

took an automobile trip to Texas. Thereafter, in July 1950, plaintiff resumed his employment, and the parties moved to Indianapolis, where their first child Pamela, was born December 4, 1950. Plaintiff traveled his territory and would return home for the weekends. Defendant testified that during the time of their residence in Indianapolis, plaintiff continued with his fits of temper and rages; that he would swear and curse at defendant and make derogatory remarks; that he would come home with lipstick on his clothing; that he would brag to defendant that he knew where and how to get women; that he would tell defendant she wasn't good for anything, even to sleep with; that she was a German swine and a Nazi, and should go back where she came from. Plaintiff denied this testimony, stating that their life in Indianapolis was the happiest time of their marriage. On April 5, 1952, while residing in Indianapolis, the second child of their marriage, Forrest, was born.

In June 1952, the parties moved to University City, Missouri, and resided there approximately one year. Defendant testified that plaintiff's conduct continued as it had been before; that he paid no attention to her or the children; that he came and went as he pleased; that he gave little help with the babies; that he continued his temper tantrums and abused her verbally and physically to the point where she on one occasion called the police. Plaintiff denied these assertions, and stated that when defendant called the police, he had returned from a ball game and defendant refused to answer the door; that he broke in and she called the police and engaged in a screaming session, accusing him of being out with another woman. He denied associating with other women. Plaintiff further testified that defendant continued to criticize the United States, and was a bad housekeeper.

In July 1953, the parties moved to 622 Bedford Oaks, and resided there until the date of their separation, August 21, 1961. Jeffrey, the third child, was born September

15, 1953. Defendant's testimony was that plaintiff's abuse toward her continued; that plaintiff exhibited complete indifference to her during her pregnancy; and that he frequently came home intoxicated. She testified in detail as to various assaults against her.

On April 15, 1954, defendant, without informing plaintiff, left for Germany with the three children. She stayed in Bremen with her parents. She returned home on September 3, 1954. Defendant was pregnant when she made this trip. On her return, Phillip, the fourth child, was born on October 15, 1954. Plaintiff's father furnished the funds for this trip. Her mother was ill when defendant and the children left, and died one week after they arrived in Bremen. Defendant testified she did not tell plaintiff of the trip before she left, because he would probably have objected and would not let her go. She stated that she took the children because they were too small to leave behind.

Plaintiff testified he first learned she had left when he arrived home from a trip and was told of her departure by neighbors, and found a card from defendant informing him of it. He denied he had forbidden her taking the children to Europe, stating that the matter was never discussed. He testified he wrote to defendant's father, made phone calls and contacted persons in Bremen, but received no correspondence from defendant, but that as a result of his correspondence with defendant's father, he met defendant and the children, upon their return, in New York.

Defendant testified that upon her return plaintiff told her things would be different; that he realized defendant was better than most other women he had known, and that from there on everything was going to be the way defendant wanted it; that he was going to treat defendant better and that he realized what he had done. Plaintiff testified he probably suggested they overlook what had happened; that at least defendant's mother got to see her grandchildren

before she died; that they would try to make the best of it from then on out and forget the past; that if the situation were reversed, he would have liked his mother to see the children, and that he tried his best to forgive and forget.

Defendant testified that shortly thereafter, plaintiff resumed his course of conduct, consisting of verbal and physical abuse; that he would come home in the early morning hours refusing to account for his whereabouts; that there were contraceptives in his suit case and in his car; that there were lipstick stains on his laundry concerning which he told defendant that if she didn't like it to lump it; that he would tell her he was waiting for her to die and that she hung around his neck like a millstone; that she was a dirty German and nothing but an ugly pig; that he began to eat his meals in the rathskeller and not with the family; that while in a rage he threw a play pen against the wall and splintered it to pieces; that on one occasion he struck and beat defendant, at which time she ran out of the house with three of the children to escape his violence; that at a social gathering he called defendant stupid; that he slapped her around and beat her; that at a party at their home, attended by other couples, plaintiff became intoxicated and stated he thought all women should be in cages, and if you wanted them, take them out, and when through with them put them back; that all he needed a woman would be one hour a week; that women were good for only one thing; that plaintiff said (referring to Anita Finder, a young girl who was a baby sitter for the parties) he would like to "lay her"; that on one occasion plaintiff took the three children and put them in his automobile, acting as though he was taking them away; that defendant, carrying Phillip, the baby, got into the car and plaintiff drove to the Kirkwood Railway Station; that he then told defendant he wanted her to get out and disappear, to shoot herself, and then slapped her in the face with a piece of paper money; that at times plaintiff would stand in front of defendant and spit in her face and yell, "sieg heil" and give the Hitler salute; that he would line up the boys and have them call in unison, "sieg heil"; that plaintiff attempted to physically throw defendant out of the house; that plaintiff shoved and beat defendant and shoved her across the breezeway and into a door, causing her to fall to the floor; that plaintiff had bent her finger back, causing injury. Plaintiff admitted injurying defendant's finger, but stated he did so because she had it under his nose, and he brushed it aside. He denied throwing the play pen, and denied telling defendant to leave the country, and go back to Germany.

Plaintiff denied the incident at the Kirkwood Railway Station, denied that he tried to throw defendant out of the home, and testified that at the time, defendant, herself, created a scene, and that he called Mrs. Schaum, a neighbor, to come and help quiet defendant, and that when Mrs. Schaum arrived, defendant was lying on the floor with her leg hooked around the piano. Mrs. Schaum testified that she had no recollection of any such incident.

Plaintiff, in an attempt to explain the "sieg heil" and Hitler salute incident, stated that he came home one day, and his eldest son asked him if he had to be in the German Army, and that his youngest son had a German medal on his shirt. He replied in the negative to his son's question, and told defendant she had no right to talk to his children about such things, and that if she had any sense, she would not do it. He said that defendant remarked that plaintiff's customers were half Jewish and that everything about America was terrible; that she kept on and on, and would not be quiet, so he raised his hand and said, "seig heil", and it so happened that the boys said the same thing. This version of the incident was denied by defendant.

Plaintiff denied being intoxicated at the party heretofore mentioned. Andrew Carver, who was at the party, testified that although on the occasion in question Mr.

Stone had been drinking, he would not consider plaintiff drunk, nor loud and boisterous; that plaintiff did not berate his wife or say anything uncomplimentary about her; that he did not hear Mr. Stone say anything uncomplimentary, lewd, or suggestive about Anita Finder. Mr. Carver did say he had observed Mr. Stone, on occasions, become angry; that he was a man possessed of a temper, but that he had never seen plaintiff in violent rages or tirades. Anita Finder testified that at the party she heard plaintiff say he would like to "lay her". Mrs. Alice Carver testified she was at the party and did not see plaintiff become intoxicated; that he remarked that Anita Finder was a fine young girl, and that she did not hear plaintiff say he would like to "lay her". Mrs. Patricia Schaum, who was also at the party, testified she heard plaintiff say he would like to "lay" Anita Finder, and that plaintiff was intoxicated at the party, and went to bed around ten o'clock.

Plaintiff further testified that on one occasion at the dinner table, defendant struck him over the head with an ice tea glass, cutting his head, which bled for three hours; that defendant had struck him on more occasions than he could possibly remember, with cans, a barometer, pans, knives and hammers; that she would bite him on the arms and face. The daughter Pamela, who was plaintiff's witness, testified that her mother broke a tea glass over plaintiff's head, but she did not know what her mother was angry about.

Defendant admitted hitting plaintiff with an ice tea glass when plaintiff called her Ilse Koch, a notorious German woman who had committed atrocities in concentration camps during the Hitler regime, and had the reputation of making lamp shades out of human skins; that plaintiff told the children she had done this, and it was then she hit him with the ice tea glass. With reference to hitting plaintiff with a barometer, plaintiff stated she had done this when he had charged her. This occasion occurred on Christmas day. She had given him the barometer as a present. She testified he charged her when she asked him why he had nothing for her.

Defendant admitted holding a knife in front of plaintiff on an occasion when he came home drunk and called her and her family horrible names. She stated she held the knife in front of him until he stopped.

Plaintiff testified that he arranged dates for customers, and that defendant objected to this. He described the girls as of the kind who were willing to go out with gentlemen, like some of Knapp Monarch customers were, to the better places, and who were not too careful how they were introduced to customers. He stated they were not "call girls", but admitted they were not women of the highest virtue. He was asked to identify each girl listed in his handwriting by only their first names in the book he had previously stated were demonstrators in the various cities, but was unable to do so, stating he could not remember. He stated, however, he had never been out with any of them, and that during his married life he at no time had intercourse with any woman other than his wife.

Plaintiff testified that on one occasion he and his wife were in Cincinnati, and while seated at a table defendant said she was tired and needed to go to bed. He further testified that she walked to the bar and spoke to a man who spoke German, then walked away with him, and he did not see her again until he returned home. This was denied by defendant. Defendant denied the occurrence, as testified to by plaintiff, stating she came home to see the children, and that she left Cincinnati that night on the midnight bus.

Plaintiff testified that on another occasion in New York, while at a restaurant, defendant flew into a rage and would not talk to him or a Mr. Carver who was with them, stating she did not like Mr. Carver. Defendant's version was that they had previously been to the theatre and plaintiff told her to stay in her seat during intermission, stating she could be replaced; that after-

wards when they went to a coffee shop she would not talk to plaintiff.

Plaintiff further testified that the house in which they lived was continually in disarray and disorder, and that he had put up with bad housekeeping for thirteen years. Witnesses Doris Erwin, Marion Saladin, Betty Ann Lash, Patricia Schaum, neighbors of the parties, and Anita Finder, who was employed as a baby sitter at times over a number of years, all testified that defendant kept the house neat and clean. They also testified that the children were kept neat and clean.

Plaintiff also related an occurrence which took place at the home when defendant threw some soda bottles he had asked for, down the stairs leading to the rathskeller. He stated that his friend Andrew Carver was present, and that defendant threw three 6-packs down the stairs. Defendant testified that she did throw one 6-pack, and that the reason for throwing it was that plaintiff was having a temper tantrum. Mr. Carver corroborated plaintiff's testimony with regard to this incident, stating that Mrs. Stone threw two cases down the steps, which were smashed all over the floor, and that Mr. Stone had not said anything uncomplimentary or nasty at the time he made the request. He also stated he thought this occurred in 1959.

In 1960, defendant made another trip to Germany, sailing on the Bremen on June 2, 1960, and returning on August 1, 1960. Plaintiff testified that defendant told him she needed to go to Germany in order to have an operation, stating she did not trust American doctors. The children were left with a housekeeper. She did not write any letters to the children, but did send them each a postcard. She wrote plaintiff, stating she had her breast removed and had five years to live. Defendant denied this, but admitted writing him that she had a growth in the female organs removed, and had only five years to live; admitted she told plaintiff she was going to Germany for medical care; admitted she did not have an operation, and stated she told plaintiff this story because he had told her for twelve years he was waiting for her death, and she thought if she told him she didn't have much longer to live, he would leave her alone.

On shipboard going over, she met one Kurt Handschuh, a resident of East Germany. Handschuh listened sympathetically to defendant's recounting the difficulties of her marriage. Defendant developed an infatuation for him, and they expressed their love for each other. While at a resort on the Baltic Sea, she wrote to Handschuh, addressing him as "Dearest Kurt", expressing her love for him, and stating she just could not go away without seeing him again. Thereafter defendant met Handschuh in Berlin on two occasions, on one of which she had sexual intercourse with him. Defendant denied any other intimacies. She testified that she did not consider this incident proper conduct, stating that she regretted the act, knew it was wrong and wished she had not done it. She also testified she had no present feelings toward Handschuh. Defendant wrote Handschuh several letters while in Germany and several after her return home. After her return plaintiff found a stack of letters three or four inches thick. He gave defendant all these letters save one, which he managed to retain without defendant's knowledge. This was a copy of the letter heretofore mentioned, written by defendant to Kurt Handschuh when defendant was in Germany. This occurred in September, 1960, shortly after defendant's return. Plaintiff stated he took the letter to his office and threw it into his desk, where it lay for months. He said he did not have it translated until August, 1961, after defendant told him she wanted to marry another man and was going to Germany when school started in the fall of 1961. He stated this was about August 15, 1961. He said he discussed the contents of the letter with the defendant, and she was not apologetic or sorry; that at the first discussion she hardly said anything; that when plaintiff started to read the letter to defendant, Pamela, the daugh-

ter, walked up behind plaintiff, and defendant reached over and tore up the letter. He further testified that on the Sunday after the Friday (August 18) that plaintiff came home with the letter, he and Pamela were playing gin rummy when defendant came down the stairs in a perturbed state of mind and accused plaintiff and Pamela of discussing the matter; that when he denied such accusation, defendant told Pamela if she thought that was bad, she (defendant) had a picture of plaintiff with another woman; that he remonstrated with her, saying he did not see how a person who had committed adultery like she had, could have the courage to say anything like that. The daughter Pamela testified that her mother did make the remark to her, but never showed her the picture. Plaintiff stated that defendant said she was not ashamed of the adultery, but was ashamed of only one thing, and that was that his filthy hands had touched the letters. Pamela gave testimony corroborating plaintiff's testimony in regard to this episode, and stated her mother told her she loved this man, and when the divorce was over she was going to marry him. Defendant denied this testimony, stating the plaintiff came into the kitchen and started to read the letter before the children, and defendant grabbed at it but plaintiff continued, and then told Pamela to go to his office with him because he had more letters there; that Pamela responded she did not want to do that.

Defendant testified that when she returned from Germany in September 1960, plaintiff did not ask her if she had been unfaithful to him while in Germany, but told her he thought he knew; that he suspected it and she did not deny it but answered, "You didn't live without somebody for three months either," whereupon he gave no answer or reply.

Defendant further stated that the foregoing conversation occurred about the middle part of September, 1960. Thereafter, and until shortly before the separation on August 21, 1961, the parties resumed sexual relations. Defendant testified that after her return from Germany in 1960, plaintiff continued to treat her the same way as he had the previous twelve years.

In an attempt to prove defendant guilty of another act of adultery, plaintiff introduced considerable evidence regarding a visit to St. Louis in 1955 by defendant's father, Carl Weingaertner, and George Walter Martens. Defendant's father was associated with Weyhauser Bank in East Germany, as Director of Foreign operations, and Martens was President of said Bank. Mr. Martens and Mr. Weingaertner came to St. Louis, registering at the Park Plaza Hotel on April 15, 1955, occupying rooms 901 and 1201, respectively. They checked out April 18, 1955. They returned to St. Louis on April 30, again registering at the Park Plaza on April 30, and checked out on May 2, 1955. Weingaertner occupied room 902 and Martens room 908. Plaintiff testified he was introduced to Mr. Martens under the name of Kurt Walter and as a champagne salesman. This was denied by Mr. Martens. There was also testimony by Chester and Patricia Schaum, neighbors of Mr. and Mrs. Stone, that they called at the Stone home one evening and Mr. Martens was introduced to them as Mr. Martens.

In further development of this scheme, plaintiff placed on the stand one Winfred Grimes, a former bellman at the Park Plaza, who had been discharged from his employment for being "loaded", who testified he saw defendant some time in April 1955, in a room somewhere on the seventh, eighth, or ninth floor of the Park Plaza Hotel, with a man and clad in what looked to him like a negligee. He stated he was making a delivery of a package to this room at the time. He then identified Mr. Martens as the man he saw in the room, from a photograph of Walter Martens. He said he thereafter told plaintiff if he ever had any trouble with his wife, to get in touch with him. Plaintiff said that in the fall of 1961 he got in touch with Mr. Grimes and learned of what Grimes claimed to have seen. He further testified that he thereafter checked at the Park Plaza and found that the record

there showed that "Mr. Walter Marten and mother" checked into room 701 on March 28, 1955, and "Mr. Walter Martens and daughter" checked out of room 701 April 11, 1955. At the trial the registration book was introduced in evidence. This book showed that the registration was Martin Walter instead of Walter Marten. When confronted with this bit of evidence, plaintiff admitted he had made a mistake. Both defendant and Walter Martens denied having been in a room in said hotel under such circumstances. The evidence further showed that defendant's father and Martens were not in St. Louis between March 28, 1955 and April 11, 1955.

The above is merely a summary of the main facts concerning this alleged episode. From a reading of all the testimony with reference thereto, we are convinced that the whole thing was a complete fabrication by plaintiff to smear his wife with a charge of misconduct which was not true.

In a further attempt to show misconduct between his wife and Mr. Martens, plaintiff placed on the stand Harry Deutman, who testified that during the week after Easter in 1955, which was April 10, 1955, he had occasion to go by the Stone house and saw a man and Mrs. Stone embracing each other. He further testified that the man was not Mr. Stone but bore a strong resemblance to the man shown in what had been identified as a photograph of Mr. Martens. He also stated that the parties were speaking German. Both defendant and Mr. Martens denied that any such occurrence took place, the latter stating he had never at any time kissed Mrs. Stone or had sexual relations with her, and at no time been with Mrs. Stone except when others were present.

Mr. Deutman further testified he had seen plaintiff angry from time to time about various things, upset about his married life, and heard him make comments which he would not want to swear to. He also stated he had been in the Stone home many times, and could see the marriage was unhappy; that he had not seen an incident where Mrs. Stone did not instigate a tirade against Mr. Stone. He further testified he had been in the Stone home every New Year's Eve for six years, and that ninety percent of the time Mrs. Stone started a tirade by saying such things as Mr. Stone did not care for her, did not want to take care of the children or do anything around the house, and that she did not have any money with which to buy food and clothes. He further stated that at parties at his house defendant would take guests aside and berate Mr. Stone's character.

Florence Elliott, secretary to plaintiff, testified that on one occasion Mrs. Stone called her on the 'phone and was very upset over a report that plaintiff was running around with a girl at Knapp Monarch. She stated she told Mrs. Stone that the report was untrue. She also testified that on one occasion she observed a scar on the top of plaintiff's head, and on two other occasions slight scratches on his face. When asked concerning plaintiff's reputation for truthfulness, honesty, and good moral character, she stated she did not think anyone had anything derogatory to say about Mr. Stone.

Robert Knapp, President of Knapp Monarch, testified that plaintiff was one of the best salesmen he ever had; that he had never known Mr. Stone to be intoxicated, and that he had an excellent reputation for truthfulness, honesty, and good moral character.

Pamela testified that her mother, in her father's presence, said she loved the man in Germany, and when the divorce was over she was going to marry him. She said she saw her father strike her mother when her mother broke the tea glass over his head, and when her mother pointed her finger at her father. She stated these were the only times she saw her father strike her mother. She further testified she never saw her father drunk. She did not remember the

incident at the railway station in Kirkwood which was testified to by defendant. She did not remember her father ever swearing at her mother, or the occasion when he threw the play pen against the wall. She stated that her mother would put her arm around her and love her some times; that her mother would not always fix breakfast for her before she went to school; that when her father was out of town they would go out to eat most of the time, but when her father was home her mother would fix the meals; that her father would sometimes eat in the rathskeller and sometimes with the family; that she had never seen her father spit at her mother, but would sometimes say "sieg heil" when her mother said things about his business and how bad the Americans were. She further testified she had never seen her brothers spit at her mother and say "sieg heil". She further testified she had heard her parents shout at each other and have many arguments about which she could not remember, but they were not really bad. She stated she never heard her father call her mother "stupid".

She testified that on one occasion her mother took a butcher knife and pointed it toward her father's throat and said Americans were filthy pigs, and her father got angry about it. She remembered the occasion when the boys found German war medals and were playing with them, and that when her father came home he said not to let the boys wear them. When asked if she loved her mother she replied, "I think a little, yes." She stated her father had never said anything about not loving or respecting her mother, nor had her father or grandmother said anything bad about her mother to the boys. She further testified that her mother, while on a visit to Imperial after the separation, said her daddy was telling lies about her and would go to jail for perjury.

Anita Finder, who worked for the Stones as a baby-sitter for about four years, testified she had observed Mr. Stone yell at Mrs. Stone, push her, use vile language

toward her like "God damn German bitch", and call the children "German blonde-headed bastards"; that he ordered Mrs. Stone around in a demanding voice, and every time he came home from work, would order her to fix him a drink and bring it to him in the basement; that not once while she was there would plaintiff have dinner with his family, but would eat alone in the rathskeller; that he would kick his sons and not spend much time with them; that when he would lose his temper and start yelling, Mrs. Stone would take the children outside and take them to the neighbors; that on such occasions plaintiff would have a wild expression, his eyes getting real big, and he would throw his arms around and yell, calling Mrs. Stone "a dirty German" and saying she wasn't decent or much of a mother. She stated that on one occasion when she was in the yard with the children, Mr. and Mrs. Stone were yelling at each other, and all of a sudden the door opened and Mr. Stone practically threw Mrs. Stone out of the door, and would not let her or the children back in the house until nightfall. She further testified she had heard Mr. Stone tell Mrs. Stone he would be glad when she went back to Germany. She said she never heard Mrs. Stone say anything derogatory about the United States or its people. She recounted an incident when Mr. Stone lined up the boys and had them say "sieg heil".

Mrs. Doris Erwin, a neighbor of Mr. and Mrs. Stone, testified that one afternoon she heard loud noises from across the street and then saw Mrs. Stone come running out of her house with three of the children; that Mrs. Stone was very upset and crying; that Mrs. Stone had a red mark on the side of her face, and told the witness that Mr. Stone had hit her on the side of the face. She stated that Mrs. Stone and the children walked up the street and later saw them sitting on the curb at the street corner; that she and her husband put them in their car and drove them to an

eating place, then later picked them up and drove around until Mrs. Stone calmed down, then drove them home. Mrs. Erwin further testified that although she never saw Mr. Stone strike Mrs. Stone, she had heard him shout at her and call her a filthy swine and an ugly pig. She recalled a party at her home where Mr. Stone referred to Mrs. Stone as stupid.

Mrs. Erwin further testified that on another occasion, about two o'clock in the morning, Mrs. Stone rang their door bell. She was very upset, hysterical, crying and sobbing, and at the time stated that Mr. Stone was beating her. She had a red mark on her face near her eye. She stayed at the Erwin home several hours, then went home.

Mrs. Saladin, another neighbor, also testified as to the occurrence related by Mrs. Erwin, when Mrs. Stone came running out of the house with the children, stating that Mr. Stone hit her. Mrs. Saladin also saw the red mark on Mrs. Stone's face. She also recalled the party at which Mr. Stone said his wife was too stupid to play cards. She stated that on another occasion she heard a scream and saw Mr. Stone shove his wife against the frame of the kitchen door.

Betty Ann Lash, a baby-sitter employed by Mr. and Mrs. Stone at times from 1954 to 1956, testified she had heard Mr. Stone curse Mrs. Stone, saying to her, "God damn, you stupid woman, can't you ever learn to do anything right," and that she observed this type of thing many times; that Mrs. Stone would be reduced to tears before Mr. Stone was through screaming and yelling.

Mrs. Schaum, next-door neighbor to the Stones, testified that when Mrs. Stone was in Germany in 1960, plaintiff, when asked if he had heard from her, said that Mrs. Stone was stupid, and if she should die tomorrow, he'd spit on her grave. She further testified she never heard Mrs. Stone make any derogatory remarks about

the United States, or the people in the United States, or the Jewish race.

Lawrence Woodcock, Minister of the Presbyterian Church at Imperial, Missouri, testified he had known plaintiff for less than a year and was unable to state what Mr. Stone's reputation was for truth, honesty, and good moral character, but had heard nothing of a derogatory nature concerning his moral conduct or character. He further testified that the children were enrolled in Sunday School and attended regularly, being brought there by plaintiff and occasionally by plaintiff's mother, Marie Stone.

James E. Freer, Superintendent of the Windsor School in Jefferson County, testified that Pamela and Phillip were on the honor roll at the school; that Forrest's grades were better than they had been prior to his coming to the school, though he did not apply himself to the utmost as few students did; and that Jeffrey's attitude was good but was inclined to be a little more mischievous, but not in a way that would cause any great difficulty. From his testimony it appears that all four children were fairly regular in attendance, well behaved, and integrated well at the school.

Woodson Smith, Principal of the Keysor School in Kirkwood, testifying from school records, stated that Pamela had always been an honor student; that the report showed that summer school was recommended for Jeffrey, but Mrs. Stone felt she did not want him to attend; that kindergarten comments respecting Jeffrey were that he was going into first grade with a shaky foundation; that Jeffrey was a dreamer, was unable to write his name and needed speech correction. The report showed that Forrest had a difficult time giving up his freedom of running around the neighborhood, and slowly conformed, but seemed to enjoy his activities, was easily influenced and needed guidance. It is a fair inference, from the evidence, that the children were making slightly better grades in the Wind-

sor School than when they attended the Keysor School in Kirkwood.

Harry Deutman testified he had seen the children frequently since the parties had separated, and considered their attitude very good; that they seemed adjusted to school, respectful to authority, and in general, had happier countenances than formerly. He testified that Mr. Stone had standing engagements with the Indian guides, took his children to Sunday School, spent time in teaching them athletics, took them hunting, and was quite concerned about and interested in the children.

Plaintiff's mother, Marie Stone, with whom the children were living at the time of the trial below, testified that the children were very active at the Windsor School; that Pamela went out for track and Volley ball and was very interested in it; that the boys played Volley ball; that Forrest was interested in baseball in the Khoury League; that the children attended church, and that when plaintiff was in town he took them to church; otherwise she took them. She further testified that defendant visited the children, and that neither she nor her son at any time told defendant she could not see the children, or had any objection to her so doing. She also testified that neither she nor her son ever said anything to the children against their mother.

Anita Finder testified that defendant was a good housekeeper, and although the boys got dirty, they were changed every day, and sometimes again in the evening if they were going some place.

Mrs. Doris Erwin, a neighbor, testified that Mrs. Stone treated her children with very much affection, and that they had her constant attention; that she never left them alone; that they were neat and clean, and that the house was as neat and clean as anybody could keep a house with little children.

Betty Ann Lash, a baby-sitter for Mr. and Mrs. Stone, testified that the Stone children and their clothing were always very clean; that the Stone household was very well kept; and that there was an abundance of food from which she or Mrs. Stone prepared the evening meal.

Mrs. Patricia Schaum, next-door neighbor to the Stones, testified that one of her children played with Pamela, that she had watched the Stone children grow up from infancy, and had been in the Stone home frequently. She stated that the Stone children were always cleanly dressed, and if they went out in the evening they would be changed again; that she never saw any disorder in the house except during the preparation of a meal, or after a meal, when there would be dirty dishes in the kitchen; that she could hear Mrs. Stone giving the children their baths on every summer evening, and during the day at various times she would be in the Stones' home and see Mrs. Stone serving the children tasty, well-prepared meals. She further testified that as far as she could see, Mr. Stone was good to the children and she had seen him take them for rides and to Sunday School. She also saw him occasionally play ball with two of them.

The final separation took place August 21, 1961. Plaintiff, prior thereto, had delivered the daughter Pamela to his mother at her home in Imperial, and on the day of the separation, by ruse, removed the other children and also placed them with his mother. Thereafter defendant was permitted to visit the children, but on account of the hostility of plaintiff and his mother toward defendant, such visits were unpleasant. There is also evidence in the record which indicates that the affection which the children previously had for their mother was being alienated.

Plaintiff contends that the court erred in failing to grant him a decree of divorce. In support of this contention, it is urged that under the admissions made by defendant, it is clear that he was entitled to a divorce. It is pointed out that defendant admitted corresponding with Mr. Hand-

schuh wherein she professed her love for him, and that she admitted spending a night with him in a hotel in Berlin, where she and Handschuh engaged in sexual intercourse. Her admission that she spent the night in a hotel room in Chicago with Walter Bloom is also urged as establishing such misconduct as to entitle plaintiff to a divorce. As to this latter charge, defendant denied that she had improper relations with Bloom at the time, and it appears that Bloom, on the occasion in question, forced himself into the room and refused to leave. It also appears that defendant at the time had been deserted by plaintiff, who had left her without means, and that she was at the time on the way to Rockford, Illinois to attempt a reconciliation with plaintiff.

Defendant, it appears, was a very truthful witness, and we believe she was telling the truth when she said there were no improper relations between her and Bloom at the time. Nor do we believe there were improper relations between defendant and Walter Martens; but that the evidence produced in support of that charge was false and a pure fabrication by plaintiff in order to make a case against defendant by whatever means he could conjure up, including false testimony on his part and the production of false testimony of others.

■ Furthermore, after considering all of the evidence, we have reached the conclusion that defendant's allegations, or most of them, were proved, and that plaintiff has been guilty of such gross indignities, cruelty, and marital misconduct as to constitute ample grounds for granting defendant a divorce from plaintiff, if it could be said that she was the innocent and injured party. In such a situation, we must hold that the court did not err in denying plaintiff a divorce.

The next point to consider is whether defendant has shown that she is the innocent and injured party and entitled to a divorce from plaintiff. We would not hesitate to so hold were it not for the affair she had with Kurt Handschuh on her last trip to Germany. The other charges of marital infidelity were, in our opinion, not sustained by the evidence.

■ The other grounds upon which plaintiff relies, being indignities, were for the most part successfully refuted, and those which were proved, mainly by defendant's admissions, were acts which plaintiff goaded defendant into performing by his cruelty and misconduct. They do not show a continuous course of conduct on her part connoting settled hate, alienation, and estrangement subversive of the marital relationship, which would warrant the granting of a divorce to plaintiff. But the affair with Kurt Handschuh, which culminated in the violation of defendant's duties as a wife, is of such a serious character as to deprive her of the status of an innocent and injured party, unless we sustain defendant's contention that her conduct in that regard was condoned by plaintiff.

■■ The term "condonation", as used in divorce law, means forgiveness and pardon after full knowledge of past wrong or fault, on condition, express or implied, that the same will not be repeated. Cohabitation, with full knowledge of the offense, is strong evidence of condonation, and where long continued, it should be taken as conclusive evidence, especially in cases where the conjugal offense is adultery. Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577.

It is urged by defendant that the evidence fully supports the plea of condonation. It is pointed out that defendant testified that within two or three weeks after her return from Germany, plaintiff said he thought he knew she had been "with somebody," and she replied, "You didn't live without somebody yourself for three months either," to which he made no reply. Plaintiff did not deny this conversation had occurred. It is also pointed out that plaintiff, around September 15, 1960, gained possession of a copy of the letter which defendant had written to Kurt Handschuh, in which she expressed her love for him,

which to plaintiff would mean that adultery had been committed. After this conversation, and after securing this letter, the parties continued to have sexual relations until a week or ten days prior to August 21, 1961, the date of the final separation.

From the foregoing evidence, it is urged that the plea of condonation was established. This argument is based upon the assumption that plaintiff gained full knowledge of defendant's infidelity from the above conversation, and the letter; and that the testimony of plaintiff, and of his secretary, that the letter was not translated or that plaintiff did not know of its contents until about eleven months after plaintiff secured possession of it, was not worthy of belief. We are not prepared to so hold, and in our judgment, plaintiff did not become aware of the full extent of defendant's misconduct with Kurt Handschuh until a few days before the final separation, and that there was no condonation of this marital offense. The court did not err in refusing defendant a divorce.

It is urged by plaintiff that the trial court, having denied both parties a divorce, was without jurisdiction to award custody of the children, and for that reason the judgment awarding their custody to defendant was error. There is no merit to this contention. Defendant not only sought custody under her cross-bill, but also in a separate count in equity, predicated upon the ground that the welfare of the children required that their general custody be in defendant, subject to plaintiff's right of visitation. Our Supreme Court held in a prohibition proceeding growing out of the instant case that the trial court had jurisdiction under said separate count to make orders respecting said custody. State ex rel. Stone v. Ferriss, Mo., 369 S.W.2d 244. In that case the order involved was one for temporary custody pending appeal, the court holding that the trial court had jurisdiction to enter an order giving defendant custody, pending appeal, notwithstanding an appeal bond had been posted.

It is urged that on the evidence, the court erred in giving general custody of the children to defendant under Count II, which was the separate count in equity to which we have made reference. In disposing of this count, the trial court made findings of fact and conclusions of law. We have reviewed those findings, and find them fully sustained by the evidence. We concur in those findings and the disposition of the issue involved. But since this is a trial de novo on the record, we will briefly state our findings and conclusions. These in the main will coincide with those of the trial court.

We find from the evidence that defendant's chief interest in life is her children, and that plaintiff's interest is that of the average father. Defendant is a devoted, conscientious, and capable mother, and a good housekeeper. Plaintiff has a high and at times uncontrollable temper, and under its influence he at times becomes very cruel and commits physical violence upon those at whom his anger is directed, which includes pushing, slapping, striking, and spitting. It is dangerous for one who is the object of his anger to be around him when he goes into a fit of rage over something connected with that person. Defendant has displayed a temper toward plaintiff at times, but in dealing with others, including the children, has exhibited an even temper. She has exhibited good judgment in the rearing of the children.

Since plaintiff works all day, the children, if placed in the custody of plaintiff, would be under the supervision of his mother. The grandmother apparently has great love for the children, and has while they are with her demonstrated her desire to do everything necessary for their well-being, with the possible exception of encouraging a healthy mother-children re- lationship between defendant and her chil-

dren. However, the grandmother is approaching her seventieth year, at which age the care of four young children is naturally burdensome, and will become more so in the future. Defendant is in her early forties, and in our judgment better qualified, by reason of her status as a mother, to properly care for their needs than is the grandmother. While the children have improved their school grades since entering the grandmother's home, we believe that this has resulted mainly from their removal from a home filled with strife and turmoil, which was due in the main to plaintiff's misconduct.

We do not believe that defendant's misconduct with Kurt Handschuh has disqualified her from receiving the custody of the children. We agree with the trial court's conclusion on this subject. The court said:

> "Defendant committed one act of adultery on a trip to Germany in 1960 for which she appears to be penitent * * *. There is no evidence, however, that defendant's one act of adultery was a part of a continuing pattern of immoral behavior, or that it caused her to neglect her children or expose them to immoral influences.
>
> *     *     *     *     *     *
>
> "In view of the foregoing, the court concludes, as did the Domestic Relations social worker who investigated the case following a request by the parties' attorney, that leaving the children in the care of their father, the plaintiff, is too great a risk, that plaintiff is not a fit person to have their permanent custody, and that it would be in the best interest of the children to be in the care and custody of their mother, the defendant, subject to the father's rights of reasonable visitation and reasonable temporary custody of said children."

It is not unusual to award custody to a mother who has been guilty of marital infidelity where all the facts and circumstances demonstrate that their best interests require such a disposition. Paxton v. Paxton, Mo.App., 319 S.W.2d 280

The judgment appealed from is affirmed.

RUDDY, P. J., and WOLFE, J., concur.

On Motion to Modify

PER CURIAM:

Defendant has filed a motion requesting a modification of our opinion so that said opinion and mandate issued pursuant thereto shall, in addition to the affirmance of the judgment, include a provision (1) directing the trial court to amend its judgment to include a provision ordering plaintiff to deliver the children of the parties to defendant on a day and time certain, at a place to be specified, (2) designating a definite date for the commencement of payment to defendant of support and maintenance for said children, and (3) directing that the court retain continuing and exclusive jurisdiction of said children during their minority.

After the filing of the above motion the matter was set down for hearing. Briefs were filed in support of and in opposition to said motion. A hearing was had on the motion, at which plaintiff and defendant appeared by counsel. The matter was fully argued and submitted to this court for determination. No objection was interposed by plaintiff to a consideration by this court of any of the matters contained in the motion on the ground that it was untimely. The parties also agreed that after the Supreme Court handed down its opinion in State ex rel. Stone v. Ferriss, 369 S.W.2d 244, the trial court set aside the post-trial order which was the subject-matter of said proceeding, and entered a new order granting plaintiff custody of the children pending the appeals to this court.

After due consideration this court is of the opinion that defendant's motion to modi-

fy should be sustained, and said opinion is hereby modified, so that in addition to the affirmance of the judgment, the trial court is ordered to amend said judgment by incorporating therein the following:

1. That plaintiff, Forrest William Stone, deliver said children to defendant, Dorothea Carla Stone, in Division No. 6 of the Circuit Court of St. Louis County, at 10:00 A.M., on the 10th day following the filing in that court of the mandate of the St. Louis Court of Appeals in this cause, unless said 10th day be on a Sunday, in which event such delivery shall be made the following day;

2. That the payments of support and maintenance for the four children heretofore provided for shall commence on the date said children are ordered delivered to defendant by the plaintiff, and shall be made semi-monthly thereafter; and

3. That the court retain continuing and exclusive jurisdiction of Pamela Stone, Forrest Stone, Philip Stone, and Jeffrey Stone, the minor children of the parties, as wards of the court during their minority.

RUDDY, P. J., and WOLFE and ANDERSON, JJ., concur.