**Wilma MYERS, (Plaintiff) Respondent,**

**v.**

**Oliver Allen MYERS, (Defendant) Appellant.**

No. 30782.

St. Louis Court of Appeals.

Missouri.

April 17, 1962.

Motion for Rehearing or for Revision of Opinion Denied May 15, 1962.

———◆———

Paul Taub, Overland, for appellant.

Thomas, Busse, Weiss, Cullen & Godfrey, Donald H. Clooney, Spencer M. Thomas, St. Louis, for respondent.

WOLFE, Judge.

This is an action for divorce, in which the wife charged the husband with indignities that rendered her condition as his wife intolerable. The husband filed a cross-bill, charging his wife with indignities. The plaintiff was granted a divorce with alimony in the sum of $100 a month, and the defendant husband has appealed.

The facts of the case are that the parties were married March 4, 1951, and they lived together until December 16, 1959. There were no children born of the marriage. During the early years of their marriage the plaintiff was employed by the telephone company. While she was so employed she turned over her paychecks to her husband, who handled the family finances. He was employed as a metal finisher at an automobile plant in St. Louis.

About three years before their separation they moved to the home of Winfield Myers, brother of Oliver Myers, the defendant. Winfield was divorced. He had three daughters, who at the time of trial were eight, six, and five years of age. It was understood at the time that the plaintiff and defendant moved to Winfield's home that the plaintiff, who was then unemployed, was to take care of her brother-in-law's children and to keep house for him and her husband. The plaintiff did this and had done so for about three years prior to her separation from the defendant.

Up to this point there is no factual disagreement, but the balance of the evidence, as it relates to the indignities charged, is quite conflicting.

The plaintiff testified that her husband was one of a large family, and that most of their recreation and entertainment was centered about his family's activities. The plaintiff testified that the defendant informed her that his family came first and that she came second. For over two years of their married life they spent almost every weekend on a farm belonging to his brother George, where the men of the family were engaged in building a house. This was a family affair, and the women and children of the family all went along. The women prepared the meals and looked after the children while the men worked.

There were, in addition to these weekend activities, holidays and birthday parties for members of the Myers family, which the family attended. The defendant stated that there were birthday parties for "every kid in our family * * *. It's definite." He further stated that on all holidays all of his family got together, including their wives. Plaintiff said that the defendant refused to visit members of her family, and was cold toward her on the few times that she visited them. She stated that on the weekend parties the defendant and his brothers would drink beer and argue, and that the affairs usually ended in drunken brawls. She also testified that the defendant spent about three nights a week out with one of his brothers or at a family gathering, where he would "sit and drink and he would just get drunk." She stated that this continued throughout their entire married life.

She also testified that her husband was demanding and domineering toward her, and that when he spoke she "had to jump".

She said that he used foul language toward her in the presence of his family and in the presence of Winfield's children. She testified that he drank beer every night and ordered her to bring beer to him, and that she brought it to him. She said that at times he came home quite late, with the odor of beer upon him, and would start to fight. She said that he beat her frequently, and that once Winfield also beat her. She testified that at times he would ask her to drive the car because he was too drunk to drive. She said that he would beat her at times in the car, and upon one occasion held her by the hair with one hand and beat her with the other, and that he held her by the hair when she tried to get out of the car.

The plaintiff suffered from menstrual irregularity and resulting nervousness. She stated that her nervousness was more pronounced in the last year of their marriage. She told her husband in December that she was going to leave him and that she wanted a divorce. She said that he asked her to stay until January as her departure at that time might upset his mother and spoil her Christmas. She agreed to stay but Winfield told her to get out, and since it was his house she left. She moved to her aunt's home, and she stated that her room and board plus doctor bills amounted to $129 a month.

The plaintiff's physician was called as a witness. He stated that he had treated her over a period of years for various common ailments and for irregularity of menstrual periods. He said that she came to him, on December 12, 1959, crying, upset, and apprehensive. He said that she had been nervous because of her disability before, but not to the extent that she was at the time of trial, and he could not say that her then present condition was caused by her menstrual difficulties.

Mrs. Lorraine Myers, a sister-in-law, was also called as a witness. She stated that the defendant was demanding and domineering toward the plaintiff. She related that on one occasion when she was present, he was lying on a couch watching television, and "he told Wilma, 'Bring me a beer,' and his attitude was right now." She said that she had seen him drink beer on many occasions, and that she had seen him under the influence of alcohol.

Two character witnesses were called for the plaintiff, and the defendant was called also, for the purpose of proving his income. He stated that he was employed as a metal finisher by the Lincoln Mercury automobile plant, and at the time of trial, which was June 28, 1960, he had been laid off since April 8, 1960. He was then drawing unemployment compensation. His pay while working averaged around $80 a week, and he was physically fit for work.

The defendant's testimony in his own behalf consisted of a categorical denial that he had ever beaten the plaintiff. He stated that only on one occasion, a number of years before, he had slapped her with provocation. He stated that he had never been drunk, that he drank one or two beers each night, and at family parties four or five. He also stated that the plaintiff always enjoyed the family outings, and that she did not need to go unless she wanted to. The defendant testified that his wife cursed him, and her statement as to this was covered by a cross-examination, in which she said that she had gone to her father's house four or five times, and that on each occasion the defendant cursed her, and she called him, "a damn dirty rat".

The defendant stated that at one time his wife attempted to stab him with a pair of scissors. Her version of this, brought out on cross-examination, was that she was goaded into going at him with a pair of scissors by his telling her that she was crazy.

The defendant's brother Winfield testified on behalf of the defendant, and he also denied that the defendant drank to excess or beat his wife, and he denied that he

had ever beaten his sister-in-law. He said that he loved her as a sister, and that she had taken good care of his house and had been good to his children. He blamed her present discontent on another sister-in-law, Lorraine, who testified for the plaintiff. He said that Lorraine was a troublemaker, and had made Wilma discontented. Two friends of the parties testified on behalf of the defendant that they had frequently been in their company and had seen no mistreatment of the plaintiff.

The points raised by the defendant, in summary, are that the plaintiff failed to prove that she was the innocent and injured party and that her evidence was incredible; that the defendant was the innocent and injured party and should have been granted a decree of divorce; and that the defendant was without ability to pay any alimony and that the award of alimony was therefore erroneous.

■ We are cited to a number of cases touching upon various well established rules regarding the sufficiency of the evidence to support a divorce decree. There is no dispute about these rules, and it would serve no purpose to restate them. It is axiomatic that our review in a case of this kind is a trial de novo in which we reach our own conclusions from the record before us. Where, however, there is sharply conflicting evidence and a determination of the case rests upon the credibility of the witnesses, we defer to the trial judge who has heard the witnesses. Pippas v. Pippas, Mo.App., 330 S.W.2d 132, and cases therein cited.

■ It would be difficult to find a case wherein the evidence of opposing parties was in greater conflict as to some of the pertinent facts. The wife's testimony disclosed a continuous course of abusive treatment, and the husband's evidence was that he was not abusive. Her evidence was that he drank to excess, and his was to the contrary. The appellant states that the plaintiff's evidence is incredible because it is denied by the husband and his brother and other witnesses. This, of course, is absurd for if true, any plaintiff would be held incredible because her testimony was contradicted by the defendant and his witnesses. The trial judge obviously believed the plaintiff, and in accordance with the above rule respecting our review, we defer to the trial judge.

■ As to the plaintiff's responding in kind to her husband's cursing and the scissor incident, we have frequently held that one does not have to be without fault to be the innocent and injured party (Bressie v. Bressie, Mo.App., 266 S.W.2d 24), and one spouse cannot complain of acts into which he had goaded the other. Kolaks v. Kolaks, Mo.App., 75 S.W.2d 600.

■ As to the alimony award of $100 a month, we do not think it excessive considering that the plaintiff was a person in ill health and unemployed. As to the capacity of the defendant to pay, the only evidence we have is that he had been laid off from work a short time before trial. There was no suggestion that this was a frequent occurrence or that it was anything more than a temporary situation. His normal pay was around $355 a month, and the award therefore appears well within his capacity to meet it.

The judgment is affirmed.

RUDDY, Acting P. J., and SAM C. BLAIR, Special Judge, concur.

ANDERSON, J., not participating.