Frank Arthur JAROS, Plaintiff-Respondent,

v.

Rita Margaret JAROS, Defendant-Appellant.

No. 32014.

St. Louis Court of Appeals.

Missouri.

Sept. 21, 1965.

Sherwood R. Volkman, St. Louis, for defendant-appellant.

Vernon Riehl, St. Louis, for plaintiff-respondent.

J. MORGAN DONELSON, Special Judge.

Frank Arthur Jaros filed his petition for divorce, and in response to plaintiff's petition defendant countered with a crossbill for divorce. Upon trial the court rendered a decree which granted a divorce to the plaintiff husband and dismissed the crossbill for divorce of defendant wife. The custody of the minor children was awarded to the plaintiff, with the right to visit said children at all reasonable times awarded to defendant. Defendant thereafter perfected this appeal.

Defendant complains that the decree of divorce was for the wrong party and that the custody of the minor children should have been granted to her. We shall review the evidence, reach our own conclusion, with due deference accorded to the findings of the trial judge. Le Claire v. Le Claire, Mo.App., 352 S.W.2d 379; Fields v. Fields, Mo.App., 343 S.W.2d 168.

The parties were married March 29, 1958, in Hernando, Mississippi, and they separated on October 22, 1963. They became the parents of three children; Frank Arthur Jaros, Jr., now aged seven years; Roy Edward Jaros, aged four years; and Tamkera Sue Jaros, aged twenty-one months.

Plaintiff testified that he treated defendant and the children with love and kindness; that he provided defendant and the children with a home, clothing, food, and treated them the best he could. He is gainfully employed, and earned about $5,000 in 1963. Plaintiff complains that defendant left him and the children over her relationship with one Walter Wurtz, an ex-convict; that they quarreled over this other man; that they also quarreled when defendant stayed away from the home until midnight to 2:00 a. m., over the care given the children, and when defendant received unexplained telephone calls; and that defendant would refuse to fix his breakfast. He further says he had to fix his own clothing and help maintain the children and himself.

When plaintiff learned of Wurtz, he told defendant he wanted to see Wurtz. Defendant telephoned Wurtz and a meeting was arranged on October 18, 1963, in the

home of plaintiff and defendant. Wurtz and defendant sat together, and defendant would have nothing to do with plaintiff. Defendant and Wurtz were hostile to plaintiff. According to plaintiff nothing was accomplished, and there was no way of reasoning with defendant and Wurtz, because they had their minds set on what they wanted and that was that. Defendant told plaintiff that the love she had for him was long gone. Plaintiff then arranged a conference with Father Kopp and defendant in their home to try to effect a reconciliation, but defendant later left the home and her family while plaintiff was at work.

After the separation, plaintiff learned that defendant was at the home of Mrs. Merle Brown, a sister of Walter Wurtz. When plaintiff went to the Brown home to see defendant, and the door was opened by Mrs. Brown, he saw defendant inside the house. Defendant stepped back from the door, and plaintiff was not admitted to the house.

During the marriage plaintiff claimed that defendant did not take very good care of the children and they lacked supervision from the defendant; that plaintiff would return home from work and defendant would not know where one of the children was. On quite a few occasions the defendant would leave the children with a neighbor or her mother for two or three hours at a time; that on said occasions and return defendant would indicate she had been shopping, but she never brought home anything to show this was true. He also said she visited a tavern and drive-in theatre without plaintiff.

After the separation, plaintiff took the children to a mutual friend at Elsimore, Missouri, who cared for the children until about December 22, 1963. The children were then returned by plaintiff to the six-room home of plaintiff's forty-eight year old mother. Plaintiff and children live on the third floor of said home. Two other adults and three children live in this home, which has heat and one bathroom.

Two witnesses testified for plaintiff that his reputation for truth, honesty, and morality was very good. In fact, one said he had worked for her, and that he was one of the finest young men she had known; that he was honest, he was trustworthy, and she would trust him with every dime she owned.

Defendant testified as to the marriage and separation. She stated she separated from plaintiff because he beat her and had blackened both eyes. She further complained that plaintiff had on many occasions struck, beat, and choked her during their marriage, beginning as early as two weeks after their marriage. She claimed plaintiff on these occasions falsely accused her of running around with other men, and that he did not trust her. Defendant stated she did not get plaintiff's breakfast for him because plaintiff said he couldn't eat breakfast. She denied any wrongful relationship with Walter Wurtz, but admitted she had known him for a long time. She also knew he was an ex-convict, and that he was twenty-eight years old. Defendant was twenty-two years old. She further admitted that she telephoned Wurtz for the conference above referred to, and that Wurtz came to the home in response to her call; that she knew Wurtz's sister, Mrs. Brown; that she had been at the Brown home at the time referred to by plaintiff and had stayed overnight at the home. Defendant denied being in a tavern with Wurtz, but defendant's witness later testified that she and defendant had been in a tavern when Wurtz was also there.

Defendant stated that she had given the children good care; that she had laundered for them, and kept house for plaintiff and the children (but admitted she was not the best housekeeper); that they had three meals a day, but not always on time. At the time the decree was rendered, defendant was living with her mother, and if she obtained custody of the children she indicated she would live elsewhere. She was not employed and had no property. After the separation, defendant agreed that the

children could be cared for in Elsimore, Missouri. Plaintiff drove defendant to see the children while in Elsimore, Missouri. Defendant admitted that plaintiff during this period did his best to get her to come back and live with him. She refused.

One witness, Mrs. Margaret Reed, testified for defendant. She testified that defendant had a very fine reputation for morality and chastity, and that when she saw the children they were always nice, clean, and well-behaved. She knew Walter Wurtz since school days. Mrs. Reed admitted Wurtz had been in a tavern when defendant and she were there together. She knew defendant's mother and her home, and she described it as a nice house, but crowded. The house is occupied by defendant, her mother, father, grandmother, brother, sister-in-law, and their four children. The witness said the house was not large enough to hold that many people.

The evidence received by the court and above outlined is within the pleadings of both parties on their respective charges of general indignities, or was received without objection and issues joined. O'Leary v. O'Leary, Mo.App., 385 S.W.2d 346.

It has been held many times that each case in which a divorce is sought on the ground of general indignities must necessarily rest upon its own factual situation. Richardson v. Richardson, Mo.App., 270 S.W.2d 68. The trial court saw the witnesses, heard the testimony, and can best judge the credibility of the witnesses and the weight to be afforded to the evidence. The evidence is conflicting. The trial court resolved the conflict by finding that defendant's conduct was subversive to the family relationship and thus rendered plaintiff's condition intolerable. It further found plaintiff was the innocent and injured party. The decree for divorce was rendered for the right party.

The problem of custody of the children is never easy, and it is especially so in this case when many facts which should be before the court are absent. It is no longer an unusual circumstance when grandparents assist in the care of children when the family relationship is disturbed or broken. Sartin v. Sartin, Mo.App., 349 S.W.2d 705. Plaintiff will also have the assistance of the children's forty-eight year old grandmother. He has initiated care for his children during the separation, with the approval of defendant. Evidence supports the conclusion that plaintiff loves, cares for, and will support the children. His character and reputation is of the highest quality.

We are aware of the oft-quoted principle that the custody of children of tender years, especially girls, should ordinarily be awarded to their mother. Thomas v. Thomas, Mo.App., 288 S.W.2d 689. If, however, the welfare and best interests of the children can best be served by awarding custody to the father, the trial court should do so, even though the mother is a fit and proper person. C—— v. B——, Mo.App., 358 S.W.2d 454; Tootle v. Tootle, Mo.App., 329 S.W.2d 218; Ballew v. Ballew, Mo.App., 288 S.W.2d 24.

Defendant's past acts of leaving the children with others for extended periods and with plaintiff on their separation; her questionable association with a known ex-convict; and her crowded home situation for the care of the children, no doubt were among the deciding factors in the placing of the custody of the children with the plaintiff rather than defendant, even though the children are of tender years. The evidence is ample to support the findings of the trial court that the welfare and best interests of the children are with their father. We will not lightly regard nor easily disturb the findings of the trial court on this issue. Shields v. Shields, Mo.App., 387 S.W.2d 242.

The decree is affirmed.

WOLFE, P. J., and RUDDY, J., concur.