Doris REEVES, Plaintiff-Respondent,

v.

Arthur REEVES, Defendant-Appellant.

No. 8475.

Springfield Court of Appeals.

Missouri.

Feb. 7, 1966.

Wangelin & Friedewald, Poplar Bluff, for defendant-appellant.

Bloodworth & Bloodworth, Poplar Bluff, for plaintiff-respondent.

STONE, Presiding Judge.

On November 25, 1964, almost eighteen years after her marriage to defendant Arthur Reeves on December 25, 1946, plaintiff Doris Reeves instituted this action for divorce by the filing of her petition in which she sought dissolution of the marital relationship on the ground of indignities [V.A. M.S. § 452.010], asked for the custody of Patricia Ann, then fifteen years of age, one of the two children born of the marriage, and prayed for alimony, child support, attorneys' fees and costs. On December 15, 1964, defendant filed his answer and cross-bill in which he sought a decree of divorce for alleged indignities and prayed for custody of both children, namely, Patricia Ann and Michael Eric, then seventeen years of age. Following trial on February 9 and 16, 1965, the court entered a decree dismissing defendant's cross-bill, granting a divorce to plaintiff on her petition, awarding custody of Patricia Ann to plaintiff and custody of Michael Eric to defendant (with each parent to have the right of reasonable visitation with the child whose custody was awarded to the other parent), and adjudging that defendant should pay to plaintiff the sum of $2,500 as alimony in gross, the additional sum of $1 on the first day of March each year as permanent alimony, and $75 per month for the support of Patricia Ann. On this appeal by defendant, he complains that plaintiff's petition should have been dismissed and he should have been granted a divorce on his cross-bill and that, in any event, the trial court erred in entering judgment against him for $2,500 as alimony in gross.

Defendant came to Poplar Bluff in September 1961 as associate sales manager in that area for a life insurance company, and he moved his family from Flat River to Poplar Bluff in February 1962. The transcript on appeal discloses nothing pertaining to the prior course of the marital venture, excepting only that plaintiff and defendant had acquired title, as tenants by the entirety, to two properties in Flat River, namely, (1) their six-room home and (2) an adjoining property to which plaintiff referred as a "small brick building" worth $1,500 and defendant's attorney referred as "a house and lot" not valued in evidence but said to have been subject to a deed of trust securing payment of approximately $230.

Within a few weeks after the family came to Poplar Bluff, to wit, about March 15, 1962, plaintiff instituted an action for divorce (hereinafter referred to as the first divorce action) in the Circuit Court of Butler County on grounds here neither revealed nor important. During April or the first part of May 1962 and while the first divorce action was pending, defendant discovered that plaintiff was having "an affair" with one L——, a resident of St. Louis, with whom (as plaintiff readily admitted upon trial of the instant case) she had had adulterous relations on two occasions at a Poplar Bluff motel. When accused of infidelity by her husband, plaintiff made full confession to him and, upon his insistence, like confession to her minister at an appointment made by her husband. On May 14, 1962, defendant "helped" plaintiff to compose, and typed for her a letter to her attorney requesting him to dismiss

the first divorce action, which was done. Thereafter, plaintiff and defendant resumed cohabitation and lived together as husband and wife for approximately two and one-half years until their separation about November 14, 1964, shortly prior to institution of the case at bar.

From plaintiff's testimony, it appears that the primary factors contributing to marital friction (subsequent to the reconciliation in May 1962) were defendant's unexplained evenings away from home, his late hours, and his habitual beer drinking. As plaintiff put it, "Art likes his good times without me, so he stays out late at night and comes in when he pleases." When asked whether defendant told her "where he went and what he did and why he was out late," plaintiff said that "sometimes he would and sometimes he didn't, but it wasn't any of my business." Marital discord mounted to a climax and the parties came to a parting of the ways on the Monday before defendant "moved out" on November 14, 1964. Defendant had gone bowling that evening as he had "so many times in the last three years." In a telephone call to plaintiff, he had told her that "I am going out and have some beer tonight and I don't want you to say anything when I come in, I intend to come in when I get good and ready"; and, when she asked where he was going, he named an establishment which, as plaintiff ascertained, closed at 1:30 A.M. When defendant came home at 2:45 A.M. "drinking as usual," he offered the explanation that "he had drank (sic) fourteen bottles of beer" and had "passed out" in his automobile after the establishment closed. In the ensuing argument, plaintiff expressed her disbelief of defendant's explanation, told him that "we can't get along this way," and invited him to leave. He did so on November 14.

Although avoiding any charge that defendant came home unable "to navigate under his own power" (to borrow the words of his attorney), plaintiff asserted that her husband had made "a practice of coming home" after he had been drinking (as he had done on the final Monday night) "four or five times a week at the last and . . . in the last three years about two or three times a week . . . anywhere from midnight until three in the morning." Plaintiff did not profess any knowledge as to whether defendant had been involved with other women—"I have never followed him." But, as plaintiff put it, "Art told me he didn't love me and he didn't want me and if we continued to live together it would be as he desired to do, and I might as well keep my mouth shut about it."

Our courts long ago recognized the impossibility of formulating any all-encompassing rule as to what will justify a decree of divorce for alleged indignities and confirmed the necessity of determining each case on its own particular facts and circumstances;[1] but, as a guide in cases of this character, it is said that indignities warranting the granting of a divorce ordinarily must amount to a continuous course of conduct by one spouse constituting a species of mental cruelty, connoting settled hatred and a plain manifestation of alienation and estrangement, and rendering the condition of the other spouse intolerable through acts of such character and frequency as to be subversive of the family relationship.[2] We have no doubt but that plaintiff's testimony, which was accepted by the trial court, showed such indignities by defendant and established plaintiff's status as that of the *injured* party.

However, she would not have been entitled to a decree of divorce unless the

1. Hooper v. Hooper, 19 Mo. 355, 357; Whitwell v. Whitwell, 318 Mo. 476, 481, 300 S.W. 455, 456; Boehme v. Boehme, Mo.App., 72 S.W.2d 115; Jaros v. Jaros, Mo.App., 395 S.W.2d 217, 220(2).

2. Heaven v. Heaven, Mo.App., 363 S.W. 2d 33, 39(8); Moore v. Moore, Mo.App., 337 S.W.2d 781, 787(4–8); Clark v. Clark, Mo.App., 306 S.W.2d 641, 646(3); Watson v. Watson, Mo.App., 291 S.W.2d 198, 200(1).

trial court reasonably could have found (as he did) that she also was the *innocent* party.[3] In our review of the evidence bearing upon this finding, we remain mindful that the requirement of innocence did not contemplate proof of such exemplary deportment or angelic perfection as to have excluded all misconduct but simply a showing that, in the circumstances of the case, plaintiff had not been guilty of such conduct as would have entitled defendant to a divorce.[4]

■ We turn to a consideration of the specific conduct on the part of plaintiff which defendant here points out in support of his contention that he should have been granted a divorce on his cross-bill. One indignity pleaded therein was that "plaintiff has threatened the life of the defendant." The evidence pertaining to this allegation follows. When asked on cross-examination whether she had told defendant "shortly before" November 14, 1964, that "you were going to shoot off a certain part of his body if you didn't get a divorce," *plaintiff* answered: "When he came in drunk . . . I said, Art, I am getting so tired of this I can't stand it. I had spent in September four days in the hospital up here for depression mostly, and I told him I couldn't stand it any longer, that I could kill him for what he was doing to me. I didn't say any portion of his body." In response to a question by his counsel directed to the same incident, *defendant* stated: "She said that if the judge didn't give her what she asked for she would." There was no suggestion that plaintiff's cry of anguish and despair was accompanied or followed by any move to inflict harm or injury upon defendant. Cf. Culp v. Culp, Mo.App., 164 S.W.2d 623, 626(4). If plaintiff's testimony was believed, defendant was in no position to rely on this incident, for it was within the category concerning which our appellate courts have observed in numerous cases that one spouse can be guilty of acts which explain and afford justification for an outburst of ill-considered conduct on the part of the other[5] or, otherwise put, that one spouse will not be heard to complain of acts into which he has goaded the other.[6] And, within this same category was plaintiff's conduct (characterized by defendant as an indignity against him) on the Monday night preceding November 14, 1964.

The only other indignities *pleaded in defendant's cross-bill* were plaintiff's institution of the first divorce action in March 1962 and her consorting with L———— prior to dismissal of that action in May 1962. Defendant admitted upon trial that, after he had discovered plaintiff's infidelity, she had made full confession thereof to him and, upon his insistence, like confession to her minister, that he (defendant) thereafter had "helped" plaintiff to compose, and had typed for her, a letter to her attorney requesting him to dismiss the first divorce action, and that, upon his (defendant's) purpose and intention "to forgive her of everything . . . to the best of my ability," the parties had become reconciled and had lived together as man and wife for two and one-half years be-

3. O'Leary v. O'Leary, Mo.App., 385 S.W. 2d 346, 351(3); Wilson v. Wilson, Mo. App., 354 S.W.2d 532, 542(3); Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319(6); Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703, 705(1).

4. Simon v. Simon, Mo., 248 S.W.2d 560, 563(2); Easton v. Easton, Mo.App., 361 S.W.2d 166, 169(4); Greco v. Greco, Mo.App., 356 S.W.2d 558, 566(4); Pippas v. Pippas, Mo.App., 330 S.W.2d 132, 137(7); Stevens v. Stevens, Mo.App., 158 S.W.2d 238, 241(5).

5. Harwell v. Harwell, Mo.App., 355 S.W. 2d 137, 141(2, 3); Schneider v. Schneider, Mo.App., 248 S.W.2d 59, 61; Garton v. Garton, Mo.App., 246 S.W.2d 832, 837(3); Scheer v. Scheer, Mo.App., 238 S.W.2d 865, 867–868; Politte v. Politte, Mo.App., 230 S.W.2d 142, 148(4).

6. Myers v. Myers, Mo.App., 356 S.W.2d 522, 525(3–5); Pipkin v. Pipkin, Mo. App., 255 S.W.2d 66, 68(2); Rowland v. Rowland, Mo.App., 227 S.W.2d 478, 484–485; Kolaks v. Kolaks, Mo.App., 75 S.W. 2d 600, 603(5).

fore they separated about November 14, 1964. All of this worked (so plaintiff insists) a condonation or " 'a blotting out' " [Ratcliff v. Ratcliff, 221 Mo.App. 944, 949, 288 S.W. 794, 796] of her prior adulterous conduct. We observe parenthetically that nothing in the record suggests that plaintiff improperly associated with any man after she and defendant were reconciled in May 1962.

In Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577, approved and commended by the Supreme Court as a "well-considered case" [Arnold v. Arnold, Mo. (banc), 222 S.W. 996, 999], distinguished predecessors on this court defined condonation as "a forgiveness and pardon after full knowledge of past wrong, fault, or deficiency on condition, express or implied, that same will not be repeated" and declared that "cohabitation offers strong evidence of such pardon and forgiveness of past conjugal offenses, increasing in probative force with the fullness of knowledge of the offense committed and the length of time continued," that "[i]n most cases where the cohabitation is long continued, it will be taken as conclusive evidence," and that this is particularly true where the conjugal offense has been adultery. 195 Mo.App. at 129–130, 189 S.W. at 578(1–3). Others have defined condonation in like terms [7] and have made similar statements as to the effect of cohabitation with knowledge of prior adultery.[8]

Instant defendant does not, and could not well, deny his condonation of plaintiff's prior adulterous conduct by his reconciliation and extended period of cohabitation with her after having obtained full knowledge of her activities. But, relying upon the holdings that condoned infidelity may be revived by a subsequent course of cruel treatment of the forgiving spouse by the one forgiven,[9] defendant contends that "condonation is not available to plaintiff" because (so he avers), after the reconciliation, "she treated him with a continual course of abuse clearly amounting to indignities" for which he should have been granted a decree of divorce.

In addition to the hereinbefore-discussed incidents pleaded in his cross-bill as alleged indignities, defendant also calls our attention to certain unpleaded matters characterized by his counsel as demonstrating plaintiff's "continual course of abuse clearly amounting to indignities." The first such matter, primarily emphasized in defendant's brief, involved *the Corning time savings account* and developed in the following manner. As a predicate for the prayer for monetary allowances, plaintiff alleged in her petition that she was "wholly destitute, without funds with which to support herself or her minor child [Patricia Ann], or to pay her attorney fees and costs." Upon trial, plaintiff testified on direct examination that she worked part time for a Poplar Bluff department store and in that employment had earned about $1,000 during 1964. On cross-examination, it was shown that, prior to separation of the parties in November 1964, defendant had paid the rent, had given plaintiff $25 per week "for groceries"—an allowance sufficient for that purpose, and had purchased some clothing for plaintiff and the two children. When asked "what happened to your money," plaintiff explained that "usually when I get a payday, I have got several things checked out that I pay for"— "I have bought a lot of clothes for the kids and bought all my clothes . . . and I sent my mother some money . . .

---

7. Stone v. Stone, Mo.App., 378 S.W.2d 824, 838(3); Geary v. Geary, Mo.App., 277 S.W.2d 327, 330(4); Robbins v. Robbins, Mo.App., 257 S.W.2d 92, 94(1).

8. Stone, supra, 378 S.W.2d at 838(4); McLanahan v. McLanahan, 104 Tenn. 217, 227, 56 S.W. 858, 861. See Lowe v. Lowe, Mo.App., 229 S.W.2d 7, 14.

9. Tootle v. Tootle, Mo.App., 329 S.W.2d 218, 221(3); Wirthman v. Wirthman, 225 Mo.App. 692, 698, 39 S.W.2d 404, 408; Ratcliff v. Ratcliff, 221 Mo.App. 944, 949, 288 S.W. 794, 796(3).

647

about $100 in the last year." Further particularizing, plaintiff said that she had paid for herself and her daughter the expenses incident to such feminine niceties as "hairdos" and "permanents," and then, apparently provoked by the searching interrogation, she petulantly added, "if you are asking me if I have any money now, no, I don't have any money."

The foregoing testimony was given by plaintiff on February 9, 1965. When additional evidence was taken on February 16, defendant testified that, during the intervening period, he had conducted a personal investigation at banks in Poplar Bluff, Dexter and Sikeston, Missouri, and in Corning, Arkansas, and thereby had discovered a time savings account of $1,020 in the joint names of plaintiff and her daughter in a bank at Corning, which said sum had been deposited there on October 29, 1964. In the absence of either denial or explanation by plaintiff, defendant's testimony on this subject should be accepted.

From time immemorial, truthfulness has been recognized as a cornerstone of morality and has been regarded with reverential respect [L—— v. N——, Mo.App., 326 S.W.2d 751, 755–756], while perjury has been condemned with the utmost severity and has visited upon its servants grave penalties and tragic consequences, exemplified in our day by V.A.M.S. §§ 557.010 and 557.020 which prescribe far more drastic and severe punishment for that offense than V.A.M.S. § 563.150 does for "open and notorious adultery," and by judicial holdings that perjury itself may demonstrate unfitness to have the care and custody of minor children.[10] So, we do not view lightly or lay aside easily the charge of defendant's counsel, cast in charitable

language, that plaintiff was guilty of "obvious misstatement of the truth"; and we are neither impressed nor moved by the only comment in plaintiff's brief pertaining to this matter, i. e., that "he [defendant] should not complain that his wife and daughter are being taken care of by his wife's frugality." The Corning time savings account was significant not as it might have indicated plaintiff's frugality but rather as it bore on her veracity and credibility, for, since that account of $1,020 was established on October 29, 1964, plaintiff was not "wholly destitute" when she swore that she was in her petition dated and filed on November 25, 1964, and her statement from the witness stand on February 9, 1965, that "no, I don't have any money," was false and untrue.

However, no issue has been raised concerning plaintiff's fitness to have the custody of her daughter, Patricia Ann. And, notwithstanding the falsity, inexcused and inexcusable on the record presented, of the above-noted averment in plaintiff's petition and her positive statement on the witness stand, the trier of the facts was not, for that reason, *required* to reject and disregard plaintiff's testimony in its entirety.[11] The credibility of the parties was for the sagacious trial judge, wise in the ways of witnesses [Wilson v. Watt, Mo., 327 S.W.2d 841, 850(10); City of Jackson ex rel. Hoffmeister v. LaChance, Mo.App., 372 S.W.2d 479, 483(3)], and credibility was "not to be determined by the application of a single standard—that of knowingly and willfully swearing falsely." Wilcox v. Coons, 362 Mo. 381, 394, 241 S.W.2d 907, 914(16). The important conclusion here compelled about the Corning time savings account is that, in fact, it was not subversive of the family

10. L—— v. N——, Mo.App., 326 S. W.2d 751, 756(9); E—— v. G——, Mo.App., 317 S.W.2d 462, 467; S—— v. G——, Mo.App., 298 S.W.2d 67, 77 (14); Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 328.

11. Stewart v. St. Louis Public Service Co., Mo.App., 233 S.W.2d 759, 766(2); Ed-

wards v. Morehouse Stave & Mfg. Co., Mo.App., 221 S.W. 744, 746(4); Link v. Harrington, 47 Mo.App. 262, 267(1). See State v. Butler, Mo., 310 S.W.2d 952, 955 (2); 98 C.J.S. Witnesses § 469, p. 344; 58 Am.Jur., Witnesses, § 872, l. c. 500.

relationship because that relationship was ruptured beyond repair about November 14, 1964, and defendant did not even learn of the account until February 1965.

■ Another matter characterized in defendant's brief as an "indignity" was plaintiff's unauthorized endorsement of defendant's name on, and cashing of, a tax refund check of $171 payable to the joint order of both spouses. Plaintiff's proffered excuse was that "every time I asked where the money was for the house, he [defendant] had no explanation—the only thing he did say, he said he just buried it away." And the comment in plaintiff's brief, i. e., that "this income tax was a joint return and was a result of a substantial portion of the tax which she paid herself from her job" and "the cashing of that check was nothing but taking back that which was already hers," is wide of the mark and wholly unpersuasive. However, this matter was not pleaded as an indignity; and, on the record as a whole, it is fairly inferable that plaintiff's action, which "was just before" the final separation about November 14, 1964, first became known to defendant after that date. Accordingly, this conduct likewise could not have contributed to the final rupture of the family relationship.

Other unpleaded matters, now urged by defendant as indignities, were: (a) that plaintiff told defendant's superior, the district manager (at a time and place not specified), that "she wanted me [defendant] to leave home and she wanted out, she didn't want to live with me any longer"; (b) that "when I would come in sometimes at nine o'clock and ask if there was anything for supper, she would say no, if you wanted supper you should have been here at five o'clock"; and (c) that plaintiff had told

him "repeatedly" after the reconciliation in May 1962 that she did not love him, this being elicited by a leading question fashioned by defendant's counsel which called for and brought forth a simple "yes, sir" from the witness. Again reminding ourselves that the credibility of the parties was for the trial judge, we think that he well might have concluded that defendant's testimony concerning these unpleaded matters did not "clearly demonstrate or plainly persuade with convincing probative force that they constitute[d] the contemplated insufferable, intolerable indignities" affording a statutory ground for divorce [V.A.M.S. § 452.010] and that his testimony was "lacking in that naturally compelling ring of sincerity manifesting innocent injury . . . ." Clemens v. Clemens, Mo., 235 S.W.2d 342, 346.

■ Although it is our duty to review this court-tried case upon both the law and the evidence as in suits of an equitable nature, we are enjoined by both rule and statute that "[t]he judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."[12] While we are not bound by the action of the trial judge, it is our duty to defer to his findings unless we can point to some reason for not doing so,[13] for, as it has been logically pointed out, an appellate court cannot declare the decree nisi to be "clearly erroneous" unless it "can discover and present some good reason for that conclusion." Pappas v. Pappas, Mo. App., 294 S.W.2d 605, 610. Painstaking examination of the record in the instant case leaves us unable to conclude that the action of the trial court in dismissing defendant's cross-bill and in granting a divorce to plaintiff as the innocent and in-

12. V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4); Spencer v. Spencer, Mo. App., 382 S.W.2d 237, 240(4); Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 436(4).

13. Bailey v. Bailey, Mo.App., 317 S.W.2d 630, 634; Grieshaber v. Grieshaber, Mo. App., 313 S.W.2d 763, 764; Oakes v. Oakes, Mo.App., 303 S.W.2d 940, 943(2); Woodman v. Woodman, Mo.App., 281 S. W.2d 555, 559(3); Forbis v. Forbis, Mo. App., 274 S.W.2d 800, 809(40).

jured party was clearly erroneous; and, with proper determination of the case depending so largely upon the credibility of the parties [Doll v. Doll, Mo.App., 327 S.W.2d 501, 504(1)], neither of whom offered any corroborating witnesses, we are not disposed to meddle with those decretal provisions. See Heaven v. Heaven, Mo. App., 363 S.W.2d 33, 39; Jenkins v. Jenkins, Mo.App., 396 S.W.2d 268, 271.

Passing to the monetary provisions of the decree, defendant does not criticize the requirements that he pay $1 each year as permanent alimony and $75 per month for the support of his minor daughter, Patricia Ann, but he complains that the judgment of $2,500 for alimony in gross "failed to take into consideration the financial situation of the parties." As associate sales manager in the Poplar Bluff area for a major life insurance company, defendant received "a base salary" of $77.50 per week and additional compensation dependent upon and varying with the insurance written and kept in force by himself and the men working under him, seven in number at the time of trial. *Plaintiff* testified that defendant's average earnings during the first six months of 1964 were $136 per week, and *defendant* stated that his "gross earnings" for 1964 were $6,900 or approximately $133 per week. Without detailing deductions or offering any actual figures, he estimated his average "take-home pay" at $100 to $110 per week.

However, the record indicates that the allowance of $2,500 as alimony in gross was not made on the basis of defendant's weekly earnings but rather was motivated by, and related to, the sale of the six-room family home at Flat River, owned by the parties as tenants by the entirety, during the Spring of 1964 for the gross sale price of $6,500. After payment of delinquent taxes, agent's commission, and other expenses incident to the sale, the sellers received (a) cash in an amount (according to plaintiff) "in the neighborhood of $3,200 to $3,300" or (according to defendant) "between $3,000 and $3,100" and (b) a note in the principal sum of $2,000, payable in monthly installments of $15 each, and secured by second deed of trust on the real estate sold. Whatever the precise amount of the cash payment may have been, plaintiff testified that defendant told her "that *we* would put the money in the savings and loan." (Emphasis ours) She did not know in whose name or names the money had been deposited until "a little later" when she "had reason to add some money," called the Poplar Bluff Loan and Building Association, and then learned that defendant had deposited $3,000 in his individual name, "payable on [his] death" to her.

Upon trial defendant said that he had deposited the sale proceeds in his individual name because "I had been threatened with a divorce practically since the inception of this marriage, and we have a lot of bills coming up, and I wanted to make certain that they would be paid," and that he had withdrawn the money "as the bills piled up, where I didn't have the money to pay them out of my current earnings, and I paid bills out of that as I went along, until it just dwindled down to nothing." The only specific bill allegedly paid from the sale proceeds, which defendant could remember at the first hearing on February 9, 1965, was the additional premium for automobile liability insurance when his teen-age son began to drive. The remainder of the sale proceeds "just dwindled down to nothing" (so he asserted) by payment of "bare necessities" for which his current earnings were insufficient. By the time he testified again on February 16, defendant had recalled that $212 of the sale proceeds had been used to discharge a note obligation for money borrowed to pay delinquent taxes on the property sold, and that $128 had been used, over his wife's protest, to join a country club—an affiliation not generally regarded as a "bare necessity" except in certain self-glorifying strata of sophisticated social climbers. But, regardless of what defendant eventually may have done with the sale

proceeds, he conceded that on May 2, 1964, he had withdrawn $300 of those proceeds from his individual account in the Loan and Building Association, and that on September 10, 1964 (only about two months before the final separation), he had closed out that account by withdrawing the entire balance of $2,740.50 (including $40.50 interest) which, so he blandly declared, he had carried in cash on his person "as long as I had it."

As for the $2,000 note secured by second deed of trust on the property sold, defendant admitted having received six monthly payments, no portion of which had been given to his wife. At the hearing on February 16, 1965, he produced the second deed of trust (not offered in evidence) but denied possession of the $2,000 note secured thereby or any knowledge of its whereabouts at that time. When he last had seen it (at a time and place not disclosed), it was (so he testified) in plaintiff's possession. However, she denied having it.

Defendant had a bank account in a Poplar Bluff bank, but the balance on deposit there was not shown. Notwithstanding his far-flung investigation at banks which had uncovered plaintiff's time savings account at Corning, Arkansas, defendant professed his inability to give any information concerning his own bank account in Poplar Bluff for the reason that: "I have no way of knowing. My check stubs (sic) were sent to my previous address, and my wife got those and wouldn't turn them over to me, and so I have no way of knowing." On the other hand, defendant had no difficulty in remembering that he still owed twenty-five monthly payments of $82.73 each on his 1964 Chrysler Newport with power equipment and air conditioning.

An award of alimony generally is regarded as an allowance in the nature of an award of damages because of the husband's breach of the marriage contract.[14] Although V.A.M.S. § 452.070 does not impose a mandatory duty upon the trial judge to award alimony to a prevailing wife,[15] an allowance usually is made "in the interest of social welfare and justice" where it is reasonable to do so [Smith v. Smith, 350 Mo. 104, 108–109, 164 S.W.2d 921, 923–924; McCormack v. McCormack, Mo.App., 238 S.W.2d 858, 862–863], based upon the principle that it is the husband's duty, insofar as he is able, to contribute such amount as will, supplemented by the wife's earnings and other income, if any, enable her to maintain a standard of living measuring up to that enjoyed at the time of the divorce.[16]

In determining whether an award of alimony should be made and, if so, in what amount, numerous factors properly may be considered, such as the financial status of the respective parties; their incomes, obligations and necessities; the contributions of each to the property accumulated during marriage; the probable future prospects of each; their ages, state of health, and ability to follow gainful occupations; their children and the custodial provisions concerning them; the duration of the marriage and whether it was contracted as one of affection or of convenience; and the conduct of the parties, particularly with regard to the cause of the divorce and the

14. Brinker v. Brinker, 360 Mo. 212, 216, 227 S.W.2d 724, 727(4); Smith v. Smith, 350 Mo. 104, 109, 164 S.W.2d 921, 924; Stone v. Stone, Mo.App., 393 S.W.2d 201, 205(8); Spencer v. Spencer, Mo.App., 382 S.W.2d 237, 242; Landreth v. Landreth, Mo.App., 326 S.W.2d 128, 133.

15. Smith, supra, 350 Mo. at 109, 164 S.W. 2d at 924; Simmons v. Simmons, Mo. App., 280 S.W.2d 877, 881(4); Stokes v. Stokes, Mo.App., 222 S.W.2d 108, 111 (4); Burtrum v. Burtrum, Mo.App., 210 S.W.2d 364, 372.

16. Adkins v. Adkins, Mo.App., 325 S.W.2d 364, 367(2, 3); Shilkett v. Shilkett, Mo. App., 285 S.W.2d 67, 70–71(4, 5); Harriman v. Harriman, Mo.App., 281 S.W.2d 566, 570.

relative or comparative responsibility of each therefor. Ridgley v. Ridgley, Mo.App., 370 S.W.2d 679, 683–684(6); Knebel v. Knebel, Mo.App., 189 S.W.2d 464, 467–468. However, the amount of an allowance is not susceptible of precise and exact determination by application of any hard and fast rule [Stokes v. Stokes, Mo.App., 222 S.W.2d 108, 111(2)], definite standard or "yardstick" [Bittel v. Bittel, Mo.App., 147 S.W.2d 139, 140(2)], or fixed formula. Burtrum v. Burtrum, Mo.App., 210 S.W.2d 364, 373. Each action brings its own facts and presents its own problems; and, in the final analysis, each determination must be governed by, and must rest upon, the particular circumstances of that case. Simon v. Simon, Mo., 248 S.W.2d 560, 568; Fields v. Fields, Mo.App., 343 S.W.2d 168, 170. The amount properly allowable is a matter committed to the sound judicial discretion of the trial chancellor, whose conclusion will be modified or set aside only for manifest abuse of that discretion. Fields, supra, 343 S.W.2d at 170(2); Landreth v. Landreth, Mo.App., 326 S.W.2d 128, 131(3); Simmons v. Simmons, Mo.App., 280 S.W.2d 877, 880(2, 3).

■ The marriage of the parties in the instant case, solemnized in the bloom of their youth, was one of affection. Plaintiff's efforts through a relatively long marital period should be recognized as having contributed to acquisition of the jointly-held home in Flat River, from the sale of which $3,000 to $3,300 in cash and a secured note for $2,000 were received. Fields, supra, 343 S.W.2d at 171; Mayor v. Mayor, Mo.App., 351 S.W.2d 810, 815. In fact, statements scattered through the record evidence the recognition of both defendant and his counsel that plaintiff has been and is entitled to share in property acquired and held by the parties as tenants by the entirety. But, as to the proceeds derived from sale of the jointly-held home, defendant's position, boldly stated in answer to an inquiry by the court, was that, since he had not required his wife to keep a record of the monies he had given her during their married life, he "expected the same consideration" in not being required to account for the sale proceeds of the home. Admittedly no part of the cash received from that sale and none of the monies subsequently collected on the secured $2,000 note have been given to plaintiff; and the trial court reasonably could have found that plaintiff derived inconsequential, if any, benefit from such disbursements as defendant may have made from those funds. Furthermore, the court certainly was not required to accept defendant's undocumented and uncorroborated representation that the $3,040.50 withdrawn from the Loan and Building Association (including $2,740.50 withdrawn about two months before the final separation) had "just dwindled down to nothing" by payment of "bare necessities."

At the time of trial, plaintiff had a savings account of $1,020 and was earning about $1,000 per year or less than $85 per month. Except upon proof of a subsequent change in conditions which would justify modification of the continuing nominal award of $1 per year [Schulte v. Schulte, Mo., 140 S.W.2d 51, 54(5); Shapiro v. Shapiro, Mo.App., 238 S.W.2d 886, 889(1)], the allowance of $2,500 alimony in gross is all that plaintiff will obtain for herself. Having carefully considered and weighed all of the considerations and factors reflected in the record, we are unable to brand the trial court's $2,500 award as a manifest abuse of sound judicial discretion. Ratcliff, supra, 221 Mo.App. at 950–951, 288 S.W. at 797(9); Fields, supra, 343 S.W.2d at 171.

■ When the case was submitted upon appeal, counsel for both parties requested us to enter judgment, pursuant to their agreement, in favor of plaintiff and against defendant in the sum of $260 for attorneys' fees and suit money on appeal. Desirous as we are to accommodate counsel, that request nevertheless must be denied for want

of jurisdiction in this court to enter judgment for such allowances on appeal. State ex rel. Clarkson v. St. Louis Court of Appeals, 88 Mo. 135; Neustaedter v. Neustaedter, Mo.App., 305 S.W.2d 40, 45(10); Price v. Price, Mo.App., 281 S.W.2d 307, 314(20); McCormack v. McCormack, Mo. App., 238 S.W.2d 858, 864(11–13); Creasey v. Creasey, 175 Mo.App. 237, 157 S.W. 862, 863–864(2). See State ex rel. Stone v. Ferriss, Mo. (banc), 369 S.W.2d 244, 250; State ex rel. Dawson v. Rombauer, 99 Mo. 216, 12 S.W. 661, 662; State ex rel. Gercke v. Seddon, 93 Mo. 520, 6 S.W. 342, 343; Dawson v. Dawson, 37 Mo.App. 207, 210.

The judgment of the circuit court is, in all respects, affirmed.

RUARK and HOGAN, JJ., concur.