Edgar L. STANFIELD, Plaintiff-Respondent,

v.

Joan A. STANFIELD, Defendant-Appellant.

No. 33181.

St. Louis Court of Appeals.

Missouri.

Dec. 17, 1968.

Louis S. Czech, Clayton, for defendant-appellant.

Aubuchon & Walsh, Ross G. Lavin, St. Louis, for plaintiff-respondent.

ELGIN T. FULLER, Special Judge.

The trial court granted a divorce to the respondent father and awarded custody of the five minor children to the father. The mother, appellant, was given visitation rights in person and by telephone and temporary custody of the children from 9:00 A.M. to 7:00 P.M. every Sunday and for three weeks during the summer months on thirty days' advance notice to the father. The mother was given temporary custody on alternate Christmas, New Year's Day, Memorial Day, July 4th, Labor Day and Thanksgiving, starting with Christmas, 1967. The defendant was awarded $2.00 per child for each day of defendant's actual temporary custody.

Defendant appeals from the order overruling her motion for a new trial. Defendant does not complain of the action of the trial court in granting the divorce, but does complain of the decree granting custody of the five children to the respondent father. Defendant contends that the best interests of the minor children would be better served by awarding custody to her. The trial court believed and decided that the children would be better off in the custody of their father. While we are not bound by the action of the trial judge, in our review of this court tried case upon both the law and the evidence, it is our duty to defer to his findings unless we can point to some reason for not doing so and unless this court is convinced that the welfare of these five children requires some other disposition. Cadenhead v. Cadenhead, Mo.App., 265 S. W.2d 426; Reeves v. Reeves, Mo.App., 399 S.W.2d 641.

The decision as to who shall have the children now rests with this court. The

ultimate test of the right to custody in this state is the spiritual, moral and physical well being of the children. The trial court may, with these factors in mind, award custody to the father, the mother, or a stranger to the blood as the circumstances require, or he may make an award to both parents. Under the ancient common law, the father was said to have a superior right of guardianship or custody over minor children, but the refinements of Christian ethics early revealed the fallacy of this theory and commenced to modify it as the best interest of the child required. The idea that the father had the absolute right superior to the mother is a dogma long since obsolete and as dead as the law of primogeniture. And then the pendulum swung in the other direction. The law then began to speak of the virtues of motherhood, how the mother toyed with her own life to bring the child into existence, how she was morally, spiritually and biologically best suited to care for the child. What a mother's care means to her children has been so much romanticized and poeticized that its reality and its substance have sometimes been lost in the flowers of rhetoric. Not all mothers can lay claim to such eulogy. And at the present time about all that can be said as a generality controlling custody matters is that as between parents no presumption can be indulged in favor of one parent against the other except in cases, *where all else is equal,* the custody of a child of *tender* years will be given to the mother. Tomlinson v. French Institute of Notre Dame De Sion, 232 Mo.App. 597, 109 S.W.2d 73; Dawson v. Dawson, Mo.App., 241 S. W.2d 725; Brake v. Brake, Mo.App., 244 S.W.2d 786. That statement of the law is of course based on the premise that the father will be at work earning a livelihood for his family, and that the child is of a tender age and that the mother will be in the home taking care of the child's needs, training the child for citizenship, developing his moral background, spiritual culture, a sense of social response and reverence for God. The mother's prefer-

ential right of custody hangs on the teaching of these elements. If the mother goes and returns as a wage earner like the father, she has no more part in the responsibility than he and it necessarily follows that *all things else being equal* she has no better claim when the matter of custody is at issue.

The defendant has regular employment, and her working hours away from the home are about the same as plaintiff's. Plaintiff testified that he returned home after work about 4:30 P.M. Defendant stated that she arrived home about 5:00 or 5:15 P.M. So from the time element that each parent has to spend with the children the mother is entitled to no preferential treatment as to custody rights.

Plaintiff, Edgar L. Stanfield, and defendant, Joan A. Stanfield, were married in St. Louis County on July 24, 1954. To this union, five children were born—three girls and two boys. The girls' ages are 13, 12 and 11. The boys are 9 and 5½ years of age. The evidence does not disclose the exact time when their marital troubles began, but it does show that defendant squirted vinegar into the running gear of the marital chassis about three and a half years prior to the trial which began November 21, 1967. The parties separated about September 17, 1966. Defendant testified that she started going out with Robert Stanfield a little over three years ago. Robert Stanfield is the brother of defendant's husband. The trial began with the testimony of a licensed private investigator who was employed by plaintiff to conduct a surveillance on the defendant. According to his testimony, defendant, Joan Stanfield, and a neighbor woman left plaintiff's and defendant's home about 8:20 P.M. August 25, 1966, in her husband's Ford automobile. They went to the Ramada Inn off of Brown Road. There the two women got out of the Ford and into a Mercury which was parked there with two men seated therein. One of the men was Robert Stanfield. The four then drove to a bar called Sallo's

Blue Lounge at St. Charles, Missouri. They drank at this bar for about two hours, leaving about midnight. Mrs. Stanfield was in the rear seat with her husband's brother. The investigator observed them "kissing and necking" in the back seat. The four drove to the Ben Franklin Motel. The defendant and Robert Stanfield went into a motel room about 12:20 A.M. August 26.

The other couple then drove to a nearby motel. About 3:30 in the morning the couple who had gone to the nearby motel returned to the Ben Franklin, and defendant and Robert Stanfield came out of the motel room. All four people then drove back to the Ramada Inn, where they sat in the car and "necked" five or ten minutes. The two women got into the Ford and drove to their homes. Photographs of the parties and of the two vehicles taken that night were introduced in evidence.

The deposition of defendant Joan Stanfield was taken October 17, 1967, a little over one month before the trial. At the deposition, defendant testified that she did not recall ever being at Sallo's Blue Lounge. She did not recall being in a tavern in St. Charles with a man other than her husband within the past four or five years, but said that it might have been possible, and finally replied, "Yes, I probably did." And upon being asked if such had occurred more than once, she replied, "You are talking back quite a while—I don't—I couldn't state for sure if it was one time, twenty times * * * in the last two years maybe once or twice." And then later she was asked if she had met Robert Stanfield in any taverns or hotels or motels within the last three or four years, to which she answered, "I met him on several other occasions, yes, by prior arrangements." She denied ever having gone into a motel bedroom with Robert Stanfield, or with any man other than her husband within the last four or five years. And when asked if she were in love with Robert Stanfield she replied, "That is hard to say." It was easier for her to say that she was not in love with her husband. She readily admitted that she had told her husband she did not love him and had asked him to leave the home prior to the separation. In the deposition, defendant further testified that she did not know who owned the house where she and the children were living after the separation. At the trial she stated that she found out who owned the house at the time she signed the lease and that Robert Stanfield owns the house—that she was confused at the time of giving her deposition. Robert Stanfield was giving her financial support; bought a bedroom set and sheets for the children's beds and Robert pays the monthly bills. She reimburses him at the end of the month.

Testimony from plaintiff's diary covering the period from August 11, 1966, to September 15, 1966, (just prior to the separation) disclosed that August 11, defendant returned to the home at 4:30 A.M.; August 16, she returned at 3:45 A.M.; August 18, around 4:00 A.M.; August 23, at 4:00 A.M.; August 25, at 4:00 A.M.; August 30, at 4:15 A.M.; September 1, at 3:45 A.M.; September 2, around 3:00 A.M.; September 8, at 3:15 A.M.; September 10, at 2:15 A.M.; September 12, at 12:15 A.M. and September 15, at 3:45 A.M. Defendant gave no explanation to plaintiff of her late hours, and when plaintiff asked his wife where she had been he was told that it was none of his business.

The defendant bowled one night a week. When she returned from bowling at 1, 2, or 3 o'clock in the morning, her husband did complain. Defendant could not understand why her husband would be angry when she returned at those hours from bowling. On two occasions she had met Robert Stanfield at the bowling alley. In any event, defendant did not cease her bowling.

Robert Stanfield was called as a witness by plaintiff. His testimony disclosed that he is a married man and resides with his wife and six children; that he is a brother

of plaintiff; that he owns the house where defendant and her children reside; that he had been with defendant in the Ben Franklin Motel but didn't remember on how many occasions. He had been at other motels with her and at the Ramada Inn with her three, four, or five times possibly. He had kissed her at her residence but not, to his knowledge, in the presence of her children. When asked if he were in love with Joan Stanfield, answered, "I don't really know."

The evidence reveals that it was the father who prepared breakfasts and many other meals for the family; that during their married life he probably cooked as many meals as his wife; that he taught his wife how to cook; that it was he who took the children to church with him; that he had changed more diapers than his wife; that he was well qualified to look after the needs of the children and had a strong love for them.

The three daughters testified. Vickie, the ten year old, told of her mother getting an unlisted telephone number, and she gave as the reason for such telephone, "I think my mom doesn't want him (her dad) calling us." She thought Uncle Bob (Robert Stanfield) came to their home almost every day of the week, and she didn't think Uncle Bob liked her dad. On one occasion she saw him put his arms around her mother. She further testified that her mother did not prepare breakfast for the children; that Vickie dresses herself and the sisters take turns dressing the youngest boy, Eddie. Dianne, the oldest daughter, stated that her mother had told her not to call her dad by telephone, but that she had called her dad four or five times after her mother had told her not to. She, too, had seen Robert Stanfield put his arms around her mother. Jacquelin, the other daughter, had seen her mother and Robert Stanfield have their arms around each other and kissing each other on one occasion. Jacquelin was the only one of the three daughters who wanted to go to Court, and when asked why she wanted to

come to the trial replied, "Because I wanted to live with my father." She testified that her mother gets up in the morning when the children do because she has to go to work; that her mother does not prepare breakfast and that the girls "fix it ourselves;" that when she lived with her mother and father her dad got breakfast; that she and her sisters iron their clothes and clean the house; that she gets Eddie up in the morning and that she and her sisters take turns dressing him.

The plaintiff charged three indignities in his petition: (a) Defendant neglected the children and declined to prepare meals for the family; (b) Defendant stayed out late at night, as often as two to three nights a week; and (c) Defendant improperly associated and kept company with another man. The evidence abundantly supports each allegation.

■ The defendant's cross-bill also alleged three indignities: (a) Plaintiff in fits of violent rage and temper, addressed vile and insulting remarks and language to defendant; (b) Plaintiff belittled and ridiculed her both privately and publicly; and (c) Plaintiff falsely accused her of associating with other men. As to the first, she testified that in August when she was getting ready to go shopping, he "started in about keeping house, going out and everything else, and he kicked the storm panel out of the door * * *, and when I got in the car he slammed the garbage cans against the car door. He resented my bowling * * * and one time when I was coming home from a bowling banquet he was mad * * * and two weeks later he comes to my neighbor's house, says I didn't come home with her, that I spent the night in a motel with another man. And about two weeks before I left he called me a whore and a lot of bad names." And when asked by her attorney, "Were they improper names or vile names or abusive?", she answered, "Cursing." On the day defendant left the home she states that he called her an un-

fit mother. As to the second charge of indignity, belittling and ridiculing defendant, she testified that if they would go to a dance he would say that she was a lousy housewife, didn't cook meals, and once at a party at a neighbor's house he was telling everybody she fixed hamburgers five nights a week; that he cut her to ribbons when in public and held her up to ridicule in the presence of the children. Neither the neighbor, friends nor the children corroborated defendant as to any of these charges. The third indignity alleged by defendant, namely, that plaintiff falsely accused her of associating with other men has been alluded to in a review of plaintiff's evidence. Defendant did not prove facts to support her cross-bill or to defeat plaintiff's cause of action for divorce. Her claimed indignities did not amount to a continuous course of conduct and did not amount to a species of mental cruelty.

■ One with even a slight knowledge of the links in human nature does not have to sleep with a philosopher's stone under his pillow to divine that the best interest of these five children will be best served by their being in the custody of their father. Next year all the children will be in school. The father, anticipating that he might be awarded the general care and custody of the children, as early as April, 1967, consulted the Catholic Charities of St. Louis and was assured that Catholic Charities would furnish him someone to take care of the children while he was at work and at such times help was needed. The trial court retains jurisdiction to assure that proper care and attention will be given these children.

The evidence regarding the personal fitness of these parents strongly supports the award and decree made by the trial court.

The judgment of the Circuit Court is, in all respects, affirmed.

RUDDY, Acting P. J., and WOLFE, J., concur.